**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DAWN BEYE, <u>et al.</u>, | : |
| | : |
| Plaintiffs, | : Civil Case No. 06-5337 |
| | : |
| v. | : **<u>OPINION</u>** |
| | : |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, <u>et al.</u>, | : Date: August 1, 2008 |
| | : |
| Defendants. | : |

|  |  |
|---|---|
| SUZANNE FOLEY, <u>et al.</u>, | : |
| | : |
| Plaintiffs, | : Civil Case No. 06-6219 |
| | : |
| v. | : |
| | : |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, <u>et al.</u>, | : |
| | : |
| Defendants. | : |

**<u>HOCHBERG, District Judge</u>**

This matter is before the Court upon Defendant Horizon Blue Cross Blue Shield of New Jersey's ("Horizon") motion to dismiss both the Beye complaint (<u>Beye</u> DKT#119) and the Foley complaint (<u>Foley</u> DKT#91), and the Magellan Defendants'[1] motion to dismiss the Beye

---

[1]     When the Court refers to "the Magellan Defendants" or "Magellan" it is referring collectively to Magellan Health Services, Inc., Green Spring Health Services, Inc. d/b/a/ Magellan Behavioral Health, and Magellan Behavioral Health of New Jersey, LLC.

Complaint (<u>Beye</u> DKT#120, 121) and the Foley Complaint (<u>Foley</u> DKT#92, 93).[2]  The Court has

jurisdiction over Plaintiffs Drazin and Byram's claims pursuant to ERISA § 502, 29 U.S.C.

§ 1132, and 28 U.S.C. § 1331.[3]  The Plaintiffs assert jurisdiction in this Court over non-ERISA

Plaintiffs Sedlak and Beye pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C.

§ 1332(d).  The Court heard oral argument in this matter on October 10, 2007, after which the

Court terminated Horizon's first motion to dismiss in order to permit Plaintiffs to amend their

complaints to add the Magellan Defendants.  The Magellan Defendants and Horizon filed the

instant motions to dismiss on January 29, 2008.

## I. FACTS

These cases are class actions brought on behalf of class members who are covered by

ERISA and non-ERISA health insurance policies issued by Defendant Horizon.[4]  All four named

Plaintiffs have daughters who suffer from eating disorders and all four Plaintiffs have sought

coverage for treatment of those disorders under the terms of their plans.  All four Plaintiffs have

been denied coverage by Horizon.  The Magellan Defendants are parties to these cases in their

---

[2]        The Magellan Defendants filed two separate motions to dismiss in both <u>Beye</u> and <u>Foley</u>, for a total of four motions.  One motion in each case was filed on behalf of Magellan Health Services, Inc., Magellan Behavioral Health, Inc. and Magellan Behavioral Health of New Jersey, LLC; the other was filed on behalf of Green Spring Health Services, Inc.  Although the motions are docketed separately, all four briefs are the same.  Because the motions are identical, the Court will not distinguish between them in this opinion.

[3]        ERISA Plaintiff Bradley was voluntarily dismissed as a named Plaintiff in the Beye Complaint on January 29, 2008.  ERISA Plaintiff Foley was voluntarily dismissed as a named Plaintiff in the Foley Complaint on July 11, 2008.

[4]        Plaintiffs Byram and Drazin's policies are governed by ERISA, 29 U.S.C. § 1001, <u>et seq.</u>, and Plaintiffs Beye and Sedlak have non-ERISA plans

role as administrators of the mental health benefits provided by the Horizon plans pursuant to the

Magellan Defendants' Managed Care Service Agreement ("MCS Agreement") with Horizon.

Plaintiffs allege that the Magellan Defendants are "authorized by Horizon to administer its

managed mental health program," Beye Compl. ¶¶ 13-16, or that the Magellan Defendants

"either individually or collectively promulgated and/or implemented claims processing criteria at

the various relevant times." Foley Compl. ¶ 11.

As in the related case DeVito v. Aetna, "the gravamen of Plaintiffs' claims is that

[Horizon] improperly denied coverage for treatment sought for their daughters' eating disorders

by improperly classifying eating disorders as 'non-Biologically Based Mental Illnesses.'" 536 F.

Supp. 2d 523, 525 (D.N.J. 2008).  Plaintiffs' claims are based upon the language of their

respective insurance policies, three of which contain language substantially similar to that

contained in the New Jersey Mental Health Parity Law.[5]  Plaintiffs Beye, Byram, and Drazin's

---

[5]        The Parity Law reads in relevant part:

"Biologically-based mental illness" means a mental or nervous condition that is caused by a biological disorder of the brain and results in a clinically significant or psychological syndrome or pattern that substantially limits the functioning of the person with the illness, including but not limited to, schizophrenia, schizoaffective disorder, major depressive disorder, bipolar disorder, paranoia and other psychotic disorders, obsessive-compulsive disorder, panic disorder and pervasive developmental disorder or autism. "Same terms and conditions" means that the health maintenance organization cannot apply different copayments, deductibles or health care services limits to biologically-based mental health care services than those applied to other medical or surgical health care services.

N.J. STAT. ANN. §§ 26:2J-4.20 (HMOs), 17:48-6v (Hospital Service Corporations), 17:48-7u (Medical Service Corporations), 17:48E-35.20 (Health Service Corporations),17:B:26-2.1s (Health Insurance other than Group and Blanket Insurance), 17B:27-46.1v (Group Health and Blanket Insurance), 17B:27A-7.5 (Individual Health Insurance Reform).

policies each contain a substantially similar definition for "Biologically-Based Mental Illness"

that tracks the Parity Law:[6]

> **Biologically-based Mental Illness** means a mental or nervous condition that is caused by biological disorder of the brain and results in a clinically significant or psychological syndrome or pattern that substantially limits the functioning of the person with the illness, including but not limited to: schizophrenia; schizoaffective disorder; major depressive disorder; bipolar disorder; paranoia and other psychotic disorders; obsessive-compulsive disorder; panic disorder and pervasive developmental disorder or autism.

Morella Cert. Ex. C (Byram Policy) at 13; see also Ex. A (Beye Policy) at 6; Ex E (Drazin

Policy) at 10.  Plaintiffs Beye, Byram, and Drazin's policies also contain a substantially similar

definition for "non-Biological-based Mental Illness":[7]

---

[6]       Non-ERISA Plaintiff Sedlak's policy differs from the other three.  Plaintiff Sedlak's policy does not include a definition of Biologically-based Mental Illness and instead contains a definition for "Mental or Nervous Condition" as follows:

> [A] condition which manifests symptoms which are primarily mental or nervous, whether organic or non-organic, biological or non-biological, chemical or non-chemical in origin and irrespective of cause, basis or inducement, for which the primary treatment is psychotherapy or psychotherapeutic methods of psychotropic medication.  Mental or Nervous Conditions include, but are not limited to, psychoses, neurotic and anxiety disorders, schizophrenic disorders, affective disorders, personality disorders, and psychological or behavioral disorders associated with transient or permanent dysfunction of the brain or related neurohormonal systems.  Mental or Nervous Condition does not include Substance Abuse or Alcoholism.

Morella Cert. Ex. F (Sedlak Policy) at 11 (emphasis added).  Plaintiff Sedlak's policy also does not contain a definition for "non-Biologically-based Mental Illness."  Finally, Plaintiff Sedlak's policy does not provide the terms of coverage for BBMIs and/or non-BBMIs.  Rather, the policy describes coverage for "Mental or Nervous Conditions and Substance Abuse" as defined by the policy.  See Morella Cert. Ex. F. at 17.  In the instant motions, Defendants do not raise any arguments that refer or rely upon the different language contained in non-ERISA Plaintiff Sedlak's policy.

[7]       The New Jersey Parity Law does not define the term "non-BBMI."

**Non-Biologically Based Mental Illness** means an Illness which manifests symptoms which are primarily mental or nervous for which the primary treatment is psychotherapy or psychotropic medication where the Illness is not biologically-based.

In determining whether or not a particular condition is a Non-Biologically-based Mental Illness, Horizon BCBSNJ may refer to the current edition of the Diagnostic and Statistical Manual of Mental Conditions of the American Psychiatric Association.

Morella Cert. Ex. C (Byram Policy) at 22; see also Ex. A (Beye Policy) at 14; Ex. E (Drazin Policy) at 23.

Three of the four Plaintiffs' policies cover treatment for BBMIs "at parity" with other illnesses as required by the New Jersey Mental Health Parity Law.[8]  In other words, treatment for BBMIs under those policies is subject only to the policy deductible and coinsurance payment, if any, and, in some cases, to preauthorization.  See Morella Cert. Ex. C (Byram Policy) at 51 ("Horizon BCBSNJ pays benefits for the . . . treatment of [BBMIs] the same way Horizon . . . would for any other Illness, if such treatment is prescribed by a Practitioner."); see also Ex. A (Beye Policy) at 20; Ex. E (Drazin Policy) at 31.  Three of the Plaintiffs' policies also contain coverage limitations for non-BBMIs, limiting inpatient and outpatient treatment for non-BBMIs

---

[8]    The relevant portion of the New Jersey Parity Law reads as follows:

Every enrollee agreement delivered, issued, executed or renewed in this State pursuant to P.L.1973, c. 337 (C.26:2J-1 et seq.) or approved for issuance or renewal in this State by the Commissioner of Health and Senior Services, on or after the effective date of this act shall provide health care services for biologically-based mental illness under the same terms and conditions as provided for any other sickness under the agreement.

N.J. STAT. ANN. §§ 26:2J-4.20 (HMOs), 17:48-6v (Hospital Service Corporations), 17:48-7u (Medical Service Corporations), 17:48E-35.20 (Health Service Corporations),17:B:26-2.1s (Health Insurance other than Group and Blanket Insurance), 17B:27-46.1v (Group Health and Blanket Insurance), 17B:27A-7.5 (Individual Health Insurance Reform).

to a certain number of days or visits per year and, in some cases, per lifetime.  See Morella Cert.

Ex. C. (Byram Policy) at 61; Ex. A (Beye Policy) at 24; Ex. E (Drazin Policy).

Plaintiffs Beye and Drazin received coverage for their daughters' eating disorders

treatments as non-BBMIs.  Both Plaintiffs exhausted the limited benefits available for non-

BBMIs under the terms of their plans.  Beye and Drazin allege that Horizon's treatment of eating

disorders as non-BBMIs improperly limited the amount of coverage to which they are entitled

under their respective policies.  Plaintiffs Byram and Sedlak's daughters were denied coverage as

"not medically necessary," and their daughters therefore did not receive even the limited

coverage available for treating non-BBMIs.  Byram and Sedlak allege that Horizon's "not

medically necessary" determination is intertwined with Horizon's BBMI/non-BBMI

determination such that Horizon's treatment of eating disorders as non-BBMI influences

Horizon's "medical necessity" determination.

Defendant Horizon filed its first motion to dismiss on April 25, 2007.  Following oral

argument on October 10, 2007,[9] the Beye Plaintiffs filed a third amended complaint (Beye

DKT#80) and the Foley Plaintiffs filed a second amended complaint (DKT#59), adding the

Magellan Defendants.  The Court terminated Horizon's motion to dismiss on January 17, 2008

pursuant to Magistrate Judge Shwartz's order that the parties submit new omnibus motions

responding to the amended complaints in their entirety.  The parties thereafter filed the instant

motions to dismiss.

---

[9]        The Court heard oral argument in DeVito v. Aetna, No. 07-0418, Beye v.
Horizon, Civ. No. 06-5337, and Foley v. Horizon, Civ. No. 06-6219, together on October 10,
2007.

## II. STANDARD

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim result in a determination on the merits at an early stage of a plaintiff's case. See Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). As a result, "plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn." Id. In order to survive a 12(b)(6) motion to dismiss, "[t]he plaintiff must allege facts sufficiently detailed to 'raise a right to relief above the speculative level,' and must 'state a claim to relief that is plausible on its face.'" Pronational Ins. Co. v. Shah, No. 07-1774, 2007 WL 2713243, *1 (E.D. Pa. Sept. 17, 2007) (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007)). As the Third Circuit has recently stated:

> The Supreme Court's Twombly formulation of the pleading standard can be summed up thus: "stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest" the required element. This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element.

Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (internal citation omitted, alteration in original) (quoting Twombly, 127 S. Ct. at 1965).

## III. ANALYSIS

### A. Horizon's Motion to Dismiss

#### 1. Burford Abstention

Horizon first argues that this Court should abstain from considering Plaintiffs' claims pursuant to the doctrine espoused in Burford v. Sun Oil Co., 319 U.S. 315 (1943). The Court considered and rejected a similar argument in Devito v. Aetna, a related case that was decided on

7

February 25, 2008, after Horizon filed the instant motions to dismiss.  See 536 F. Supp. 2d 523

(D.N.J. 2008).  Because Horizon's argument is indistinguishable from Aetna's argument in

Devito v. Aetna, the Court will quote at length from its opinion in Devito where relevant.

The Court set forth the appropriate test for determining when a court should defer under

Burford.  The Court explained

> Under Burford, the Court undertakes a two-step analysis.  "The first question
> [when considering Burford abstention] is whether 'timely and adequate state-court
> review' is available."  Riley v. Simmons, 45 F.3d 764, 771 (3d Cir. 1995) (citing
> New Orleans Public Service, Inc. v. Council of City of New Orleans, 491 U.S.
> 350, 361 (1989) ("NOPSI")).  The second prong of the Burford doctrine, as
> refined in NOPSI, requires a court to examine three issues: "(1) whether the
> particular regulatory scheme involves a matter of substantial public concern, (2)
> whether it is 'the sort of complex, technical regulatory scheme to which the
> Burford abstention doctrine usually is applied,' and (3) whether federal review of
> a party's claims would interfere with the state's efforts to establish and maintain a
> coherent regulatory policy."  Chiropractic Am. v. Lavecchia, 180 F.3d 99, 105 (3d
> Cir. 1999) (internal citation omitted).  "Federal courts more readily abstain from a
> case that contains no issue of federal law."  Lac D'Amiante du Quebec, Ltee v.
> Am. Home Assur. Co., 864 F.2d 1033, 1044 (3d Cir. 1988).

Id. at 527-28.[10]

_____

[10]     With regard to the ERISA Plaintiffs Byram and Drazin, it is also worth repeating
the Court's reminder to the parties in DeVito:

> At the outset it is critical to clarify the issues presented by Plaintiffs' Complaint[s].
> Plaintiffs do not challenge New Jersey's Parity Law.  See N.J. Stat. Ann. § 26:2J-4.20.
> Rather, Plaintiffs challenge Defendant[s'] . . . handling of Plaintiffs' benefit claims under
> the contractual terms of Plaintiffs' respective insurance policies. [See Foley Compl. ¶ 13
> ("The language of the Parity law has been expressly incorporated by reference in each of
> the Horizon policies for the named plaintiffs and the proposed class."); Beye Compl. ¶¶
> 22-25 ("According to all these Horizon plans, defendants are legally obligated to provide
> unlimited in-patient and out-patient coverage for BBMI conditions . . . .").]  Although
> certain definitions in Plaintiffs' insurance contracts are substantially similar to some
> contained in the Parity Law, the claims before the court concern [Defendants']
> interpretation of the contractual language as applied to each Plaintiff.  Plaintiffs, in
> essence, contend that their eating disorders should have been handled as Biologically
> Based Mental Illnesses and covered under the policy provisions that apply to BBMIs.

Turning to the second prong first, Defendants argue that this is the kind of case "where the state has created a complex regulatory scheme central to state interests and federal jurisdiction would be disruptive of the state's efforts." Chandler v. Omnicare/HMO, Inc., 756 F. Supp. 187, 189 (D.N.J. 1990). In particular, Defendants argue that "legislation is pending that would amend the Parity Law to mandate coverage for eating disorders. In other words, the Legislature is currently addressing the very question posed by Plaintiffs' claims." Hor. Mot. at 11. As the Court explained in DeVito:

> Defendants argue that this pending legislature is grounds for Burford abstention. Although a pending bill may be enacted into law and, in the future, change the Parity Law, such a change would not provide coverage to Plaintiffs for the time period relevant to this case. This case involves claims for past coverage of eating disorders and Defendants do not suggest that the proposed bill would apply retroactively. See Transcript of 10/10/2007 Oral Argument ("Tr.") at 84(1)-(8) (conceding that proposed bill is not retroactive).[11] A potential, prospective change in the law does not provide a basis for this Court to abstain from deciding a claim based on contractual language [contained in the relevant policies]. . . .

Id. at 528.

Both the ERISA and non-ERISA Plaintiffs claim that Horizon breached the terms of their insurance contracts. As a result, "[w]hether the Parity Law is changed or modified does not affect this case. The . . . language in the insurance policies governs this case, regardless of

---

"The denial of benefits by an ERISA plan administrator or fiduciary is reviewed under the arbitrary and capricious standard." Brandeburg v. Corning Inc. Pension Plan for Hourly Employees, 243 Fed App'x 671, 672-73 (3d Cir. 2007); see also Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 393 (3d Cir. 2000) (adopting sliding scale to determine level of scrutiny in arbitrary and capricious review).

536 F. Supp. 2d at 527.

[11]   As noted above, the Court held oral argument on the motions to dismiss in Beye, Foley, and DeVito together on October 10, 2008. At oral argument it was Horizon's counsel who conceded that "the current draft of the law is not retroactive." Tr. at 84(5)-(6).

further changes in the Parity Law." Id.   In the instant cases, "the Court is asked . . . to consider the terms of Plaintiffs' insurance policies and [Horizon]'s handling of benefit claims made pursuant to those policies. Id.   In other words, in addressing Plaintiffs' claims, the Court is not faced with "complex policy trade-offs between costs and coverage" or "[c]omplex policy and clinical decisions".  Mot. at 10.  The Court need only interpret Plaintiffs' contracts of insurance, and, in the case of the ERISA Plaintiffs, consider whether Defendants' denials of coverage were arbitrary and capricious.  This is a routine task that is familiar to this and all federal district courts and is not grounds for Burford abstention.

Turning back to the first prong of Burford, Horizon argues that the state scheme provides for timely and adequate state court review, and that this Court should therefore abstain from hearing Plaintiffs' claims.  Hor. Mot. at 11.  Defendant argues that under New Jersey Appellate Rule 2:2-3(a)(2), Plaintiffs could have appealed an adverse IURO decision to the Superior Court of New Jersey.[12]  The mere availability of review by an IURO and the Appellate Division neither compels nor warrants Burford abstention and nothing in Burford suggests otherwise.  See DeVito, 536 F. Supp. 2d at 528-29; see also Glushakow v. Confederation Life Ins. Co., No. 94-4201, 1994 WL 803204, at *6 (D.N.J. Dec. 5, 1994) (citing Burford, 319 U.S. at 362) ("[t]he mere existence of a complex state administrative scheme, or the potential for conflict with that scheme will not support Burford abstention").  This is particularly true with regard to the ERISA Plaintiffs.  It would be inconsistent with ERISA for this Court to defer to state courts on a question that Congress so explicitly intended to be heard in a federal forum.  "Congress enacted

---

[12]     New Jersey Appellate Rule 2:2-3(a)(2) provides in relevant part that "appeals may be taken to the Appellate Division as of right (2) to review final decisions or actions of any state administrative agency or officer. . . ."

ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. § 1001(b)). The possibility of review in the Appellate Division is not grounds for Burford abstention as to either the ERISA or non-ERISA Plaintiffs.

For the reasons stated above, the Court will not abstain from Plaintiffs' claims based on the doctrine expounded in Burford v. Sun Oil Co., 319 U.S. 315 (1943). This Court has before it a case arising from an insurer's allegedly improper denial of benefits, in both the ERISA and non-ERISA contexts. Such familiar claims are not the sort to which Burford abstention ordinarily is applied. See Chiropractic Am., 180 F.3d at 105.

### ii. Exhaustion of IURO Review and "Primary Jurisdiction"

Horizon argues in the alternative that, if the Court does not defer under Burford, then it should either dismiss ERISA Plaintiff Drazin's claim for failure to exhaust his right to IURO review or the Court should "exercise its discretion" and defer to the "primary jurisdiction" of DOBI.[13] Mot. at 14. The Court rejected these argument in DeVito. See 536 F. Supp. 2d at 527, 529. In any event, it appears that ERISA Plaintiff Drazin has since exhausted his right to IURO review, see Foley Opp. at 20, thereby mooting these arguments. Horizon does not press these arguments in its reply brief.

### iii. Subject Matter Jurisdiction and Appellate Review of an IURO Decision

Horizon next argues that the Court must dismiss the claims of ERISA Plaintiff Byram and

---

[13]      Beye, Byram, and Sedlak have exhausted their right to IURO review.

non-ERISA Plaintiffs Beye and Sedlak for failure to appeal their adverse IURO decisions to the Appellate Division.  This argument was essentially abandoned as to ERISA Plaintiff Byram at oral argument.  See Tr. 49(22)-(25) ("Well, if you've got an ERISA beneficiary, we do agree that they would have the right to come to federal court.").  Beneficiaries and participants in ERISA plans have a right to have their claims heard in federal court without regard to diversity or amount in controversy.  See 29 U.S.C. §§ 1132(d), (e).  ERISA Plaintiff Byram is not required to appeal his adverse IURO ruling to the Appellate Division before filing suit in this Court.

Moreover, by its own terms New Jersey Rule of Court 2:2-3(a)(2) does not require this Court to defer the instant dispute to an IURO.  The rule states in relevant part that "appeals may be taken to the Appellate Division as of right . . . (2) to review final decisions or actions of any state administrative agency or officer . . . ."  N.J. R. Ct. 2:2-3(a)(2).  However, Defendants do not cite – and the Court has been unable to locate – any case or statute in which an IURO is described as a "state administrative agency or officer."  "State Agency" is defined in the New Jersey Administrative Procedures Act as

> each of the principal departments in the executive branch of the State Government, and all boards, divisions, commissions, agencies, departments, councils, authorities, offices or officers within any such departments now existing or hereafter established and authorized by statute to make, adopt or promulgate rules or adjudicate contested cases, except the office of the Governor.

N.J. Stat. Ann. § 52:14B-2(a).  By contrast, the New Jersey code defines "IURO" as follows:

> 'Independent utilization review organization (IURO)' means an independent organization, comprised of physicians and other health care professionals representative of the active practitioners in New Jersey, with which the Department contracts in accordance with [N.J. Admin. Code §] 11:24-8.8 to conduct independent medical necessity or appropriateness of services appeal reviews brought by a member or provider on behalf of the member, with the member's consent.

N.J. ADMIN. CODE. § 11:24-1.2 (emphasis added).  Although the APA's definition of "State

Agency" provides a long and apparently exhaustive list of state bodies included within the

definition, that list does not include "independent organization."  Furthermore, the APA's

definition of "State Agency" does not appear to encompass an organization whose relationship

with the state is contractual, and whose determinations are not subject to review by an actual

State Agency, in this case the New Jersey Department of Banking and Insurance ("DOBI").  See

N.J. STAT. ANN. §§ 26:2S-12(a) ("The commissioner shall contract with one or more

independent utilization review organizations in the State that meet the requirements of this act to

conduct the appeal reviews."); 26:2S-12(c) ("If all or part of the organization's decision is in

favor of the covered person, the carrier shall promptly provide coverage for the health care

services found by the organization to be medically necessary covered services.").  The Court

declines to find that IUROs are administrative agencies for purposes of Rule 2:2-3(a)(2).[14]  None

of the Plaintiffs are required to appeal their adverse IURO decisions to the Appellate Division

before seeking relief in this Court.

iv. Claims of "Not Medically Necessary" Plaintiffs Byram and Sedlak

---

[14]        The cases Defendant cites are not to the contrary.  In In re Failure by the Dept. of
Banking and Ins. to Transmit a Proposed Dental Fee Schedule to OAL, 764 A.2d 494, 498 (N.J.
Super. Ct. App. Div. 2001), the New Jersey Dental Association sued to compel the New Jersey
DOBI to revise a dental fee schedule to reflect inflation, pursuant to a provision of the New
Jersey code.  In Trantino v. New Jersey State Parole Bd., 687 A.2d 274, 287 (N.J. Super. Ct.
App. Div. 1997), the Appellate Division held that the New Jersey Superior Court Law Division
did not have jurisdiction over an appeal from a New Jersey Parole Board decision because,
pursuant to Rule 2:2-3(a)(2), the petitioner's appeal was to the Appellate Division.  Unlike
"independent organizations" like IUROs, "departments" like DOBI and "boards" like the Parole
Board are explicitly encompassed within the APA's definition of "State Agencies."  As a result,
these cases offer little support for Defendant's argument.

Both Horizon and Magellan[15] move to dismiss all claims brought by non-ERISA Plaintiff Sedlak and ERISA Plaintiff Byram, both of whom were denied benefits as "not medically necessary."[16]  The crux of both Defendants' argument is that "[t]he No Medical Necessity Plaintiffs' claims are nothing but speculation," Hor. Mot. at 19, and "medical necessity" is a threshold issue "because Plaintiffs' policies prohibit coverage for treatment that is not medically necessary whether or not the illness is BBMI."  Hor. Mot. at 3.  Defendants' position is that, because the medical necessity decision precedes and is independent of the BBMI/non-BBMI determination, those Plaintiffs who were denied on medical necessity grounds were never subject to the BBMI/non-BBMI determination, and therefore have failed to state a claim upon which relief may be granted.

Similarly to the Plaintiffs in DeVito, however, Plaintiffs Byram and Sedlak have alleged that Defendants' "medical necessity" determination is pretextual and intertwined with Defendants' allegedly improper treatment of eating disorders as non-BBMI.  See Beye Compl. ¶ 24 ("Moreover, even in those circumstances where Horizon and Magellan decline coverage

---

[15]     The Magellan Defendants make several of the same arguments made by Horizon. Where both Horizon and the Magellan Defendants make the same argument, the Court note that fact and deal with those arguments together in this section.  The Court addresses the Magellan Defendants' separate arguments in Part III.B, infra.

[16]     The Magellan Defendants' motion identifies Plaintiffs Byram and Drazin as the Plaintiffs who were denied benefits as "not medically necessary."  See Mag. Mot. at 35. According to the joint chart the parties provided to the Court, however, Plaintiff Drazin's "not medically necessary" determination was reversed on IURO review, after which his daughter exhausted her non-BBMI benefits.  See Nagel Cert. Ex. A; Foley DKT#87.  By contrast, Sedlak's "not medically necessary" determination was affirmed by the IURO.  See id.  Based on the information provided to the Court, it appears that Horizon correctly identified Plaintiffs Sedlak and Byram as the "not medically necessary" Plaintiffs.

under the guise that the treatment is 'not medically necessary or appropriate', the issue of whether eating disorders are BBMI . . . is the threshold issue that must first be resolved in order to determine the amount and extent of coverage available under the Horizon policies."); Foley Compl. ¶ 16 ("The determination of the non-biologic basis of the eating disorders is intertwined with and one of the bas[e]s of the position of Horizon and Magellan that the care and treatment for the eating disorders is not medically necessary.").  As a result, the Court's analysis is the same as in DeVito:

> Plaintiff[s Byram and Sedlak] must demonstrate – either at trial or in a subsequent motion [for summary judgment] – the connection between those claims denied as "not medically necessary" and Defendants' allegedly improper treatment of eating disorders as non-BBMIs.  This may be a difficult burden for Plaintiff[s] . . . to carry, but [their] allegations nevertheless entitle [them] to proceed with discovery at this stage of the litigation.

DeVito, 536 F. Supp. 2d at 532.  In DeVito, the Court also clarified that

> Plaintiffs do not allege that Defendants are required to find all treatment for eating disorders "medically necessary."  Rather, Plaintiffs allege that Defendants' denial of claims on grounds that the treatment was "not medically necessary" was pretextual.  Plaintiffs allege that Defendants have improperly denied some claims as "not medically necessary" because of Defendants' policy of denying all such claims in violation of the terms of Plaintiffs' contracts.  Whether Plaintiffs' pretext allegations are true or false is an issue that will be determined when the case reaches the merits stage.

Id. at n.7.

In certain respects, the Plaintiffs in Beye and Foley may have an even more difficult burden to demonstrate pretext.  Unlike the Plaintiffs in DeVito, both Byram and Sedlak appealed their "not medically necessary" determinations to IUROs, and in both cases the IUROs affirmed Horizon's decision.  While the IURO decisions are persuasive evidence that Horizon's "not medically necessary" determinations were non-pretextual, Plaintiffs Byram and Sedlak will have

15

the opportunity to take discovery on this issue.  This issue may be appropriately raised in a

subsequent motion for summary judgment.

v. ERISA Preemption of Common Law and State Claims

Horizon and Magellan move to dismiss the state and common law claims of the two

ERISA Plaintiffs, Byram and Drazin.  Specifically, Defendants move to dismiss counts one

(common law breach of contract), two (common law breach of implied duty of good faith and fair

dealing), four (statutory violations of New Jersey's Parity Law), five (statutory violations of the

New Jersey Consumer Fraud Act), six (statutory violations of the Pennsylvania Unfair Trade

Practices and Consumer Protections Law), seven (common law unjust enrichment), eight

(common law misrepresentation), nine (tortious interference with contract rights), and ten (third

party beneficiary breach of contract) of the Beye Complaint, and counts two (Parity Law claim)

and four (New Jersey Consumer Fraud Act claim) of the Foley Complaint.

The critical determination for purposes of ERISA preemption is whether Plaintiffs' claims

"relate to" an ERISA benefit plan.  It is well established that § 514(a)

> preempts 'any and all State laws insofar as they may now or hereafter relate to any
> employee benefit plan' covered by ERISA.  In this context, the term 'State law'
> encompasses state common law causes of action, as it includes 'all laws, decisions,
> rules, regulations or other state action having the effect of law, of any State.'

Sciotto v. US Healthcare Systems of Pa., No. 01-4973, 2001 WL 1550812, at *1 (E.D. Pa. Dec. 5,

2001) (internal citations omitted) (citing 29 U.S.C. §§ 1144(c)(1), 1144(a)).  "Relate to" has been

interpreted broadly by the Supreme Court to mean "if [the claim] has a connection with or

reference to such a plan."  Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97 (1983) (cited in Sciotto,

2001 WL 1550812).

16

The Court discussed ERISA preemption in <u>DeVito</u>.  There, the Court noted:

> In <u>Aetna Health Inc. v. Davila</u> the Supreme Court noted that "ERISA's 'comprehensive legislative scheme' includes 'an integrated system of procedures for enforcement.' This integrated enforcement mechanism, ERISA § 502(a) . . . is a distinctive feature of ERISA, and essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans." 542 U.S. 200, 208 (2004) (internal citations omitted). The [Supreme] Court went on to conclude that[:]
>
> > [i]t follows that if an individual brings suit complaining of a denial of coverage for medical care, where the individual is entitled to such coverage only because of the terms of an ERISA-regulated employee benefit plan, and where no legal duty (state or federal) independent of ERISA or the plan terms is violated, then the suit falls "within the scope of" ERISA § 502(a)(1)(B). In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B).

<u>DeVito</u>, 536 F. Supp. 2d at 530 (quoting <u>Aetna Health</u>, 542 U.S. 200, 210 (2004)).  The Court will undertake the same analysis for the cases presently at bar.

ERISA Plaintiff Drazin concedes that his Parity Law claim and his New Jersey Consumer Fraud Act claim are preempted by ERISA.  <u>See</u> Foley Opp. at 16 ("Plaintiffs concede that it [sic] may not pursue the state law claims as to those plaintiffs whose right to benefits are governed by ERISA.").  The Court will grant Defendants' motion to dismiss the ERISA Plaintiff Drazin's Parity Law claim and New Jersey Consumer Fraud Act claim.

ERISA Plaintiff Byram has not been as forthcoming in assessing the impact of this Court's ruling in <u>DeVito</u> on his Parity Law claim.  For that reason, it is worth restating the Court's analysis so there is no question as to the nature of the claims that have survived the instant motions to dismiss.  As the Court explained in <u>DeVito</u>,

17

Plaintiffs' [ERISA] policies contain language substantially similar to that contained in the Parity Law. As a result, even if the Parity Law provides a private cause of action, the parity language contained in Plaintiffs' [ERISA] policies is coterminous with any privately enforceable right that might arise under the Parity Law. The Court therefore finds that [ERISA] Plaintiffs would have no private cause of action under the Parity law that they do not already have under the terms of their respective policies. This point is critical to the Court's preemption analysis.

***

In the case at bar, Plaintiffs' alleged entitlement to benefits under either the Parity Law or ERISA arises "only because of the terms of an ERISA-regulated employee benefit plan. . . ." [Aetna Health, 542 U.S. at 210]  Stated differently, Parity Law "liability would exist here only because of [Defendants'] administration of ERISA-regulated benefit plans. [Defendants'] potential liability under the [Parity Law] in th[is] case[ ], then, derives entirely from the particular rights and obligations established by the benefit plans." Id. at 213. Further, because the parity language in Plaintiffs' policies gives rise to the same rights as those arguably available under the Parity Law, "no legal duty (state or federal) independent of . . . the plan terms [has been] violated." Id. In other words, Defendants' duties under the Parity Law are identical to their duties under the parity language in Plaintiffs' policies. Therefore, because Plaintiffs can bring their claims under ERISA § 502(a)(1)(B), and because there is no other independent legal duty implicated by Defendants' actions, any individual cause of action under the Parity Law would be completely pre-empted by ERISA § 502(a)(1)(B) and the Supreme Court's preemption analysis in Aetna Health.

DeVito, 536 F. Supp. 2d at 529-30.

Plaintiff Byram argues that because her contract contains language that provides rights substantially similar to those provided by the Parity Law, she may also pursue her claim under the Parity Law.  See Beye Opp. at 16 ("As a result all plaintiffs may pursue their claims under the Parity Law."), 21 ("As discussed supra, Byram may assert claims under the Parity Law as these claims are expressly incorporated into her contract.").  This is not so.  As the above quotation makes clear, in DeVito the Court was explicit that all Parity Law claims are preempted as to ERISA Plaintiffs who have contractual rights coterminous with those arguably provided by the

Parity Law.  To be clear, this is not, as Byram would have it, the same thing as saying that ERISA Plaintiffs may pursue their Parity Law claim.  Based on the Parity-Law-like language in their contracts, the ERISA Plaintiffs may pursue their <u>contractual</u> claim to benefits governed by all the familiar ERISA processes and procedures.  To the extent that the Parity Law may provide an implied right of action, those Parity Law claims are dismissed as preempted with respect to ERISA Plaintiffs Byram and Drazin.

Byram also argues that she "may . . . assert state law claims for unjust enrichment, misrepresentation, and consumer fraud" because "these claims are independent of the ERISA relationship. . . ."  Beye Opp. at 21.  The gravamen of the Byram's misrepresentation claims is that, when Byram subscribed to the plan, "Horizon represented . . . that it provided unlimited in-patient coverage for BBMI conditions. . . ."  <u>See</u> Beye Compl. ¶ 47; <u>see also</u> Beye Opp. at 22 ("Plaintiffs expected to receive parity coverage for BBMIs when they subscribed to the policies based on Horizon's representations that their insurance provided such coverage."), 23 ("Specifically, Plaintiffs contend that they were induced into subscribing to Horizon's policies based on defendant's misrepresentations of parity coverage.").  After Byram subscribed to the plan, however, Byram alleges that "Horizon and/or Magellan acted arbitrarily and capriciously or otherwise wrongfully by determining eating disorders were non-BBMI. . . ."  Beye Compl. ¶ 47.

Byram argues that claims against "sellers of insurance for misrepresentations used to induce people to purchase or subscribe to their plans" are not preempted by ERISA § 514 (a).  Byram contends that because she was not an ERISA beneficiary at the time of the alleged misrepresentations, her misrepresentation claims are "too remote to be found to relate to the plan."  Beye Opp. at 23.  That is not so.  Byram's misrepresentation claims are entirely dependent on her

19

rights to benefits under the terms of her ERISA plan.  Hypothetically, in order to adjudge
Horizon's representation that it covers BBMI at parity a *mis*representation, the Court must
necessarily determine whether eating disorders are, in fact, BBMIs.  Horizon's initial
representation must be measured against something and, in this case, it must be measured against
the benefits provided under the terms of Plaintiffs' plan.  See Woodworker's Supply, Inc. v.
Principal Mut. Life Ins. Co., 170 F.3d 985, 990 (10th Cir. 1999) (noting four categories of claims
preempted by ERISA, including "common-law rules providing remedies for misconduct growing
out of the administration of such plans.").  As a result, all of Plaintiff Byram's misrepresentation
claims unquestionably "relate to" her claim for benefits under § 502(a).  The Court need not
interpret "'relate to' . . . to extend to the furthest stretch of its indeterminacy" to reach that
conclusion.  N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514
U.S. 645, 655 (1995).

The cases Byram cites are not to the contrary.  In Wilson v. Zoellner the Eighth Circuit
reversed the District Court's holding that Plaintiff's negligent misrepresentation claim was
preempted by ERISA. 114 F.3d 713, 718 (8th Cir. 1997).  However, the plaintiff in Wilson was
not seeking benefits under the terms of his ERISA plan.  Id. ("Wilson is similarly not seeking
benefits under the Prudential policy. Indeed, Wilson's claim to plan benefits was conclusively
decided by this Court . . . and Wilson has not attempted to relitigate the issue of the scope of the
Prudential policy's coverage.  Wilson is seeking nothing from the ERISA plan itself. . . .").
Unlike in the case at bar, the District Court in Wilson could assess the plaintiff's
misrepresentation claim without referring to the terms of the plan and, consequently, the
plaintiff's claim in Wilson did not "relate to" or depend on the plan in the way Byram's present

20

claims do.

In Martin v. Pate, the plaintiff alleged that the insurer "knew or should have known of plaintiff's pre-existing condition and that despite such knowledge defendants represented that the 'policy [issued by Continental] would insure plaintiff for such pre-existing condition.'"  749 F. Supp. 242, 245 (S.D. Ala. 1990).  Based upon the defendant's representation, the plaintiff ended his previous coverage and subscribed to the defendant's plan.  In spite of the defendant's representations, the defendant subsequently denied coverage for the plaintiff's heart surgery.  The court held that the plaintiff's fraudulent inducement claim was not preempted by ERISA because "[t]his Court does not view Martin's fraud claim as based on improper processing of his claim for benefits and thus Pilot Life is not controlling."  Id. at 245-46.  In Martin, the plaintiff presented evidence of the defendant's initial representation and knowledge, and defendant's subsequent denial of coverage, and those two facts were sufficient to state a misrepresentation claim independent of the ERISA plan.  As a result, Plaintiff's fraudulent inducement claim did not require the court to determine whether the plaintiff was due benefits under the terms of the plan. Martin is unlike the case at bar because Byram's misrepresentation claims are "based on improper processing of [her] claim for benefits" – specifically, the allegedly improper processing of eating disorder claims as non-BBMI claims.  Byram's present claims would require an additional finding as to whether eating disorders are BBMIs under the terms of the plan.[17]  That finding clearly

---

[17]     Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co. is inapposite because it does not concern the provision of benefits under the terms of an ERISA plan.  170 F.3d 985, 987 (10th Cir. 1999).  When the plaintiff was in the market for a new insurer for its employees, the plaintiff sought to enter into a "contingent premium contract."  "Woodworker's experience with this arrangement had been positive . . . and it never had to make an additional payment [to the insurer] at the end of the year."  Id. at 988.  In order to induce the plaintiff into purchasing defendant's insurance, the defendant quoted inadequate rates to the plaintiff.  Consequently,

"relates to" the terms of Byram's ERISA-regulated plan.

For the above reasons, the Court will grant Defendants' motion to dismiss Byram's remaining state law claims for common law unjust enrichment (count seven), and common law misrepresentation (count eight), and Byram's claim under the New Jersey Consumer Fraud Act (count five) as preempted by ERISA § 514(a) and § 502(a).[18]

### v. ERISA Claims of non-ERISA Plaintiffs

To the extent that the <u>Beye</u> and <u>Foley</u> complaints can be read to state ERISA claims on behalf of the non-ERISA Plaintiffs, Horizon moves to dismiss those claims. An ERISA claim

---

"Principal Mutual's omissions resulted in a significant charge at the end of 1994 as well as a large rate increase for the following year." <u>Id.</u> at 989. The plaintiff sued for unfair trade practices and fraud stemming from the inadequate rates defendant charged. The Court was not required to interpret the terms of an ERISA plan, or to determine whether an insurer acted arbitrarily and capriciously in denying benefits. Plaintiff's claim in <u>Woodworker's Supply</u> does not "relate to" the plan in the same direct way as do the claims at bar.

[18]    Byram concedes that she cannot state claims for common law breach of contact (count one) or breach of implied duty of good faith (count two). <u>See</u> Beye Opp. at 21 n.7. Byram does not mention or attempt to preserve her state-law claims for tortious interference with contract rights (count nine) or third party beneficiary breach of contract (count ten). Those claims are also clearly preempted by ERISA. <u>See, e.g.</u>, <u>Paneccasio v. Unisource Worldwide, Inc.</u>, --- F.3d ---, 2008 WL 2629653, at *11 (2d Cir. July 7, 2008) (tortious interference with contract claim preempted by ERISA); <u>Rud v. Liberty Life Assur. Co. of Boston</u>, 438 F.3d 772, 777 (7th Cir. 2006) (third party beneficiary claim preempted by ERISA).
        Byram is a New Jersey citizen and therefore has no grounds upon which to bring a claim under the Pennsylvania Unfair Trade Practices and Consumer Protections Law. <u>See, e.g.</u>, <u>Baker v. Family Credit Counseling Corp.</u>, 440 F. Supp. 2d 392, 413 (E.D. Pa. 2006) ("[T]he Court agrees with defendants that the UTPCPL provides a remedy only to Pennsylvania residents. Thus, [the] non-Pennsylvania residents . . . do not have a cause of action under the UTPCPL."). However, in the event that the Beye Plaintiffs have a Pennsylvania ERISA plaintiff at the time of class certification, the Court notes that "[n]umerous district courts in the Third Circuit have held that claims alleging violations of Pennsylvania's insurer bad faith statute and Unfair Trade Practices and Consumer Protections Law ('UTPCPL') are preempted by ERISA when they related to an employee benefit plan." <u>Erbe v. Billeter</u>, No. 06-0113, 2006 WL 3227765, at *7 n.5 (W.D. Pa. Nov. 3, 2006).

may only be brought by a "participant or beneficiary" of an ERISA plan.  See 29 U.S.C.

§ 1132(a)(1).  To the extent that the non-ERISA Plaintiffs' bring ERISA claims, the Court will

grant Defendants' motion to dismiss those claims.

vi. Parity Law Claim

Both Horizon and Magellan move to dismiss Plaintiffs' Parity Law claims, arguing that

the Parity Law does not provide an implied private cause of action.  As discussed in Part III.A.v,

supra, the Court will grant Defendants' motion to dismiss the ERISA Plaintiffs' Parity Law claims

for the reasons discussed in that section.

Determining whether the New Jersey Mental Health Parity Law provides a private right of

action for the non-ERISA Plaintiffs is a considerably more difficult question.  The Parity Law

explicitly provides for enforcement by the State Commissioner of Health.  N.J. Stat. Ann.

§§ 26:2J-24, 26:2J-2.  The Parity Law does not explicitly provide a private cause of action, and

New Jersey courts have yet to determine whether the statute provides an implied cause of action.

The Court reserved judgment on this question in DeVito after concluding that, even if there were

an implied cause of action under the Parity Law, it would be preempted by ERISA § 514(a).  See

DeVito, 536 F. Supp. 2d at 529-30.  The Plaintiffs now ask the Court to consider this question

with regard to non-ERISA Plaintiffs Beye and Sedlak.

All the parties agree that the applicable test for determining whether a statute provides an

implied cause of action is set forth in R.J. Gaydos Ins. Agency, Inc. v. National Consumer Co.,

168 N.J. 255 (2001).  In that case the New Jersey Supreme Court explained:

> To determine if a statute confers an implied private right of action, courts consider
> whether: (1) plaintiff is a member of the class for whose special benefit the statute
> was enacted; (2) there is any evidence that the Legislature intended to create a

23

private right of action under the statute; and (3) it is consistent with the underlying purposes of the legislative scheme to infer the existence of such a remedy.

R.J. Gaydos, 773 A.2d at 1143 (citing Cort v. Ash, 422 U.S. 66 (1975)).[19]  Plaintiffs specifically direct the court to the third prong, noting that, although "the legislative history of the statue is silent on the issue, inferring a private remedy would be consistent with the underlying purpose of the legislative scheme. . . ."  Foley Opp. at 30; see also Beye Opp. at 17 ("there does not appear to be direct history as to the intent of the Legislature in enacting the law").

This inquiry is a delicate one that raises serious issues of comity and federalism.  Since Cort was decided, federal courts have become increasingly reluctant to imply causes of action in federal laws.  See, e.g., Thompson v. Thompson, 484 U.S. 174, 190 (1988) (Scalia, J., concurring) ("this Court has long since abandoned its hospitable attitude towards implied rights of action.").  Moreover, federal courts have largely avoided finding implied causes of action based on the third prong of the Cort test – the prong upon which Plaintiffs rely – and have instead focused the inquiry on the legislature's intent.  See, e.g., First Pacific Bancorp, Inc. v. Helfer, 224 F.3d 1117, 1121-22 (9th Cir. 2000) ("Though the Supreme Court never indicated that the four Cort factors carried different weight, subsequent decisions have emphasized that the key inquiry is whether Congress intended to provide the plaintiff with a private right of action. Indeed, there has even been some suggestion that Cort has been overruled." (internal citations omitted)); Ruccolo v. BDP, International, Inc., No. 95-2300, 1996 WL 735575, at *4 (D.N.J. March 25, 1996)

---

[19]        The test set forth in Cort has four factors, the fourth being "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"  Cort, 422 U.S. at 78.  That question is not relevant at the state level, of course, and was therefore not adopted by the New Jersey Supreme Court in R.J. Gaydos.

(discussing the change in law since Cort).  Federalism and comity dictate that federal courts should be even less inclined to increase state-law liability by finding such implied rights in state laws.[20]  If the Court is required to determine whether the Parity Law provides an implied cause of action, the Court will, of course, apply the test as applied by New Jersey courts.  The Court merely notes the federal trend away from finding implied causes of action as another reason to defer this difficult question until it is squarely presented.

The question is not yet squarely presented because, at this stage of the case, the Court is not yet certain of its jurisdiction over the non-ERISA Plaintiffs.[21]  Plaintiffs assert that this Court has jurisdiction over the non-ERISA Plaintiffs pursuant to CAFA, 28 U.S.C. § 1332(d).[22] Plaintiffs, as "the party invoking federal jurisdiction[,] bear[] the burden of demonstrating its existence. . . ."  Hart v. FedEx Ground Package System Inc., 457 F.3d 675, 679 (7th Cir. 2006). Plaintiffs have demonstrated minimal diversity and alleged that the class consists of at least 100

---

[20]	As the Seventh Circuit recently noted, "[w]ithout state authority to guide us, '[w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path (at least until the [state] Supreme Court tells us differently).'"  Pisciotta v. Old Nat. Bancorp, 499 F.3d 629, 635-36 (7th Cir. 2007).

[21]	The Foley non-ERISA Plaintiffs have filed a claim in New Jersey state court, Nancy Reinhard v. Horizon, et al, No. ESX-L-618-08, and they are "prepared to pursue all non-ERISA claims in that action if the Court determines that there is no supplemental or CAFA jurisdiction for the non-ERISA . . . claims."  See Opp. at 28 n.6.

[22]	Plaintiffs also assert supplemental jurisdiction under 28 U.S.C. § 1367.  That section sets forth a discretionary standard in § 1367(c).  By contrast, if the "home state controversy" and "local controversy" exceptions to CAFA apply, those sections direct that the Court shall decline jurisdiction over the matter.  Compare 28 U.S.C. § 1332(d)(4) ("[a] district court shall decline to exercise jurisdiction") with 28 U.S.C. § 1367(c).  Because the exceptions in § 1332(d)(4) are mandatory, the Court should determine whether it is precluded from exercising jurisdiction under § 1332(d)(4) first, before considering whether it will exercise supplemental jurisdiction under 28 U.S.C. § 1367.

members and the amount in controversy exceeds $5,000,000.

Defendants take issue with Plaintiffs' jurisdictional allegations, but, at this stage, do not offer evidence to refute Plaintiffs' assertions. Magellan notes that "[b]ecause discovery is ongoing, it is not clear at this point whether the claims of the non-ERISA plaintiffs satisfy CAFA's amount in controversy requirement." Mag. Mot. at 2 n.1. Horizon made similar allegations in its November 29, 2007 supplemental brief, alleging that "Plaintiffs will be unable to show [that the amount in controversy exceeds] $5,000,000" and that "Horizon is in the process of compiling potential damages and putative class membership numbers and expects to have such information shortly."[23] See Horizon's Brief on Subject Matter Jurisdiction ("Subj. Mat. Br.") (DKT#52) at 3 & n.3.

CAFA also provides a "home-state controversy" exception in § 1332(d)(4)(B) and a "local controversy" exception in § 1332(d)(4)(A). Under those exceptions, the Court "shall" decline to exercise jurisdiction if, among other things, greater than two-thirds of the plaintiff classes are citizens of the state in which the action was filed.[24] See 28 U.S.C. § 1332(d)(4). "[T]he party

---

[23]    As all parties are aware, "subject-matter jurisdiction, because it involves the court's power to hear a case, can never be forfeited or waived." Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006). Yet, without submitting any additional evidence, Defendant Horizon submitted a letter to the Court on January 18, 2008 "respectfully request[ing] that the Court render its decision" on subject matter jurisdiction. See DKT#82. Horizon's letter provides no grounds upon which this Court could render a final decision on this issue. Horizon's letter does no more than state that Plaintiffs have alleged damages in excess of $5 million, and that, because Magellan is an out of state defendant, "the 'home state' exception may no longer apply." With respect to the first point, the discovery needed to determine the amount in controversy is entirely and uniquely within Horizon's control. With respect to the second point, it is unclear what impact, if any, the presence of an out of state defendant has under § 1332(d)(4)(A) or § 1332(d)(4)(B).

[24]    Both Magellan and the Beye Plaintiffs discuss whether Magellan is a "primary defendant" for purposes of § 1332(d)(4)(B). See Mag. Mot. at 12; Beye Opp. at 9. Because

seeking to take advantage of the home-state or local exception to CAFA jurisdiction has the

burden of showing that it applies."  Hart, 457 F.3d at 679; see also Preston v. Tenet Healthsystem

Memorial Medical Center, Inc., 485 F.3d 804, 813 (5th Cir. 2007).  In its instant motions,

Magellan asserts that more than two-thirds of the Plaintiff class is from New Jersey and Horizon

is the primary defendant, and therefore CAFA's "home state controversy exception" applies.[25]

Mag. Mot. at 12.  Horizon made a similar argument in its supplemental brief on subject matter

jurisdiction.  In that brief, Horizon argued that only 29.7% of Horizon's insureds are citizens of a

state other than New Jersey, and that there is "no reason why the citizenship of the putative class

would be any different from the citizenship of Horizon's insureds generally."  Subj. Mat. Br. at 4.

Defendants have still not provided this Court with sufficient evidence upon which to base its

determination.

Because the issue has not been fully briefed, the Court does not reach the question of

whether the Parity Law provides an implied cause of action for the non-ERISA Plaintiffs.  During

the pendency of this motion, the parties completed discovery.  Based on that discovery, the Court

will provide Defendants with thirty days to move for dismissal for lack of subject matter

jurisdiction over the non-ERISA Plaintiffs.  Alternatively, if there is no dispute between the

parties as to this Court's jurisdiction over the non-ERISA Plaintiffs, the parties shall file a joint

statement setting forth the factual basis for the Court's jurisdiction (or lack thereof), along with

---

neither Magellan nor Horizon has presented evidence that greater than two-thirds of the class
members are from New Jersey, it would be premature for the Court to address this question of
law at this time.  The Court also notes that the parties have not discussed the "local controversy"
exception set forth in § 1332(d)(4)(A), which does not contain the "primary defendant" language.

[25]     Even if neither § 1332(d)(4)(A) or § 1332(d)(4)(B) apply, CAFA's discretionary
exception, found in § 1332(d)(3), may apply.

accompanying proof.  In the interim, the Court will deny Defendants' motion to dismiss the non-ERISA Plaintiffs' Parity Law claim without prejudice to re-raising it in a subsequent motion for summary judgment if the Court concludes that it has jurisdiction over the non-ERISA Plaintiffs.

### viii. Other Claims

Horizon moves to dismiss certain common law claims of non-ERISA Plaintiffs Beye and Sedlak. Specifically, Horizon moves to dismiss Beye's common law misrepresentation claim, Beye and Sedlak's New Jersey Consumer Fraud Act claims, Beye's Pennsylvania Consumer Fraud Act Claim, and Beye's Unjust Enrichment claim.  Magellan moves to dismiss Beye's common law breach of fiduciary duty claim, Beye and Sedlak's third party beneficiary breach of contract claim, Beye and Sedlak's tortious interference with contract claim, Beye and Sedlak's New Jersey Consumer Fraud Act claims, and Beye's Pennsylvania Consumer Fraud Act claim.  For the reasons stated in Part III.A.vi, supra, the Court denies Defendants' motions without prejudice to being renewed if the Court concludes that it has jurisdiction over the non-ERISA Plaintiffs.

Both Horizon and Magellan also move to dismiss the Foley Plaintiffs' ERISA breach of fiduciary duty claim as duplicative of the Foley Plaintiffs' ERISA breach of contract claim.  The Court addressed and rejected this argument in DeVito:

> Defendants move to dismiss Plaintiffs' Third Count for breach of fiduciary duty. Defendants argue that Plaintiffs' breach of fiduciary duty claim pursuant to ERISA § 502(a)(3) is duplicative of their claim for benefits under ERISA § 502(a)(1)(B). Defendants direct the Court to Varity Corp. v. Howe, 516 U.S. 489, 515 (1996) to support their argument that a plaintiff may not bring a claim for breach of fiduciary duty that is duplicative of her claim for benefits under § 502(a)(1)(B).

> There is a split among circuits and within this district as to the effect of Varity Corp. and Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002), on a plaintiff's ability to simultaneously pursue claims for benefits under § 502(a)(1)(B) and for breach of fiduciary duty under § 502(a)(3).  See, e.g., Wolfe v. Lu, No. 06-

0079, 2007 WL 1007181, *8-9 (W.D. Pa. Mar. 30, 2007) (noting that "the issue has been addressed by many district courts within our circuit with differing results" and collecting cases); Tannenbaum v. UNUM Life Ins. Co. of Am., No. 03-1410, 2004 WL 1084658, *3 (E.D. Pa. Feb. 27, 2004) (noting that "[t]he courts of appeals are split over whether Varity ever permits a plaintiff who has been denied benefits to simultaneously bring an action for benefits under § 1132(a)(1)(B) and an action for breach of fiduciary duty under § 1132(a)(3)(B)" and collecting cases). The Third Circuit has not expressly addressed this issue. See Wolfe, 2007 WL 1007181 at *8.

The Court is persuaded by the reasoning of those courts that have found that Varity does not establish a bright-line rule at the motion to dismiss stage of the case. See, e.g., Wolfe, 2007 WL 1007181 at *8-9; Parente v. Bell Atl. Pa., No. 99-5478, 2000 WL 419981, *3 (E.D. Pa. Apr. 18, 2000) ("Instead of a bright-line rule, Varity requires an inquiry into whether 'Congress provided adequate relief for a beneficiary's injury.'"); Moore v. First Union Corp., No. 00-2512, 2000 WL 1052140, *1 (E.D. Pa. July 24, 2000) ("As was recently noted by this Court, Varity does not propose a bright-line rule that a claim for equitable relief under § 1132(a)(3) should be dismissed when a plaintiff also brings a claim under § 1132(a)(1)(B)"); see also Crummett v. Metro. Life Ins. Co., No. 06-1450, 2007 WL 2071704, *3 (D.D.C. Jul. 16, 2007) ("The court agrees that dismissal of § 502(a)(3) claims should not automatically occur simply because a complaint also brings § 502(a)(1)(B) claims.").

Several cases in this circuit have concluded that claims under § 1132(a)(3) are not properly dismissed at the motion to dismiss stage merely because a plaintiff has also brought a claim under § 1132(a)(1)(B). See, e.g., Wolfe, 2007 WL 1007181 at *9 ("This Court concludes that the holding of Varity does not mandate dismissal of a § 1132(a)(3)(B) claim whenever a § 1132(a)(1)(B) claim is also brought. At [the motion to dismiss stage], Plaintiff should be allowed to pursue both claims."); Tannenbaum, 2004 WL 1084658 at * 4 ("It is too early in these proceedings to decide whether Plaintiff is contractually entitled to benefits under the Plan. If Plaintiff is not entitled to benefits under the Plan, Plaintiff might still be entitled to 'other appropriate equitable relief' to remedy any breaches of fiduciary duty by Defendants."); Nicolaysen v. BP Amoco Chem. Co., No. 01-5465, 2002 WL 1060587, at * 2 (E.D. Pa. May 23, 2002) ("[The court] denies the motion to dismiss as applied to Plaintiffs' claims for breach of fiduciary duty at this time. Defendants' argument may be reasserted at the summary judgment stage."); Moore v. First Union Corp., No. 00-2512, 2000 WL 1052140, *1 (E.D. Pa. July 24, 2000) (To dismiss Count II of plaintiff's complaint at this stage would be premature. Therefore, defendants' motion to dismiss will be denied."). Defendants' motion to dismiss on this basis is denied at this time; it may be renewed in a summary judgment motion after full discovery.

DeVito, 536 F. Supp. at 533-34.  Based upon the Court's analysis in DeVito, the Court will deny

Defendants' motion to dismiss the Foley ERISA Plaintiffs' breach of fiduciary duty claim.

### B. Magellan's Motion to Dismiss

To the extent that the Magellan Defendants' motions to dismiss raise the same arguments

as those raised by Horizon, those arguments are considered above.  Magellan also raises certain

arguments that are inapplicable to Horizon, as set forth herein.

### 1. Magellan Health Services, Inc. and Magellan Behavioral Health, Inc. are not Parties to the Managed Care Service Agreement ("MCS Agreement") with Horizon

Magellan moves to dismiss all claims against Magellan Health Services, Inc. and Magellan

Behavioral Health, Inc. because those entities are not signatories to the MCS agreement with

Horizon.  Magellan argues that these entities cannot be held liable for breaching a contract to

which they were not signatories.  See, e.g., Fox Fuel, a Div. of Keroscene, Inc. v. Delaware County

Schools Joint Purchasing Bd., 856 F. Supp. 945, 953 (E.D. Pa. 1994) ("It is fundamental contract

law that one cannot be liable for a breach of contract unless one is a party to that contract.").

Plaintiffs concede that only Green Spring Health Services, Inc. and Magellan New Jersey

are signatories to the MCS agreements with Horizon.  However, the Foley Plaintiffs have alleged

that Magellan Health Services, Inc. and Magellan Behavioral Health, Inc. "promulgated and/or

implemented claims processing criteria at the various relevant times."  Foley Compl. ¶ 11.  The

Beye Plaintiffs have alleged that Magellan Health Services, Inc. and Magellan Behavioral Health,

Inc. are "speciality organization[s] authorized by Horizon to administer its managed mental health

system."  Beye Compl. ¶¶ 13, 15.  Moreover, the Complaints both note that Green Spring has done

business as Magellan Behavioral Health, Inc.[26]  See Beye Compl. ¶ 14; Foley Compl. ¶ 9.

Plaintiffs do not bring claims against Magellan Health Services, Inc. and Magellan Behavioral Health, Inc. merely because those entities are related to the MCS signatories by way of the same corporate family tree.  Rather, Plaintiffs have alleged that Magellan Health Services, Inc. and Magellan Behavioral Health, Inc. are involved in the allegedly improper claim processing. These allegations entitle Plaintiffs to discovery on this issue and the Court will therefore deny Magellan's motion to dismiss on this ground.

### ii. Magellan is not an ERISA Fiduciary

Magellan moves to dismiss Drazin's ERISA breach of fiduciary duty claim brought pursuant to § 502(a)(3).  Magellan argues that, as a matter of law, it is not an ERISA fiduciary and Drazin's claim against it must therefore be dismissed.  ERISA defines a fiduciary in § 1002(21)(A).  That definition explains that

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  As another court in this Circuit has explained,

---

[26]  Magellan concedes that "doing business as" another company does not create a separate entity under the law.  See Trustees of the Mason Tenders, Dist. Council Welfare Fund, Pension Fund, Annuity Fund and Training Program Fund v. Faulkner, 484 F. Supp. 2d 254, 257 (S.D.N.Y. 2007) ("Doing business under another name does not create an entity [distinct] from the person operating the business.").  If Magellan Behavioral Health, Inc. is not a separate entity under the law from Green Spring, and Green Spring is a signatory to the MCS, there is no reason to dismiss the claims against Magellan Behavioral Health, Inc.

in order to hold [defendant] liable for breach of a fiduciary duty, plaintiffs must establish that (1) [defendant] performed discretionary functions for the plan, and (2) those particular functions are related to the breach of duty claimed by plaintiffs.  In other words, there must be a nexus between the breach and the discretionary authority exercised.

Marks v. Independence Blue Cross, 71 F. Supp. 2d 432, 434 (E.D. Pa. 1999) (internal citations omitted).

Because the determination of whether a party is an ERISA fiduciary is "a functional one", Smith v. Provident Bank, 170 F.3d 609, 613 (6th Cir. 1999), the determination will not typically be resolved at the motion to dismiss stage.  None of the five cases Magellan cites were decided at the motion to dismiss stage.  See Klosterman v. Western General Management, Inc., 32 F.3d 1119, 1120 (7th Cir. 1994) (Plaintiff-appellants "appeal a district court order entering summary judgment against them on each count of their complaint. . . . "); Coleman v. Nationwide Life Ins. Col, 969 F.2d 54, 61 (4th Cir. 1992) ("The court . . . upheld the grant of summary judgment for Coleman on fiduciary duty grounds. Both parties now appeal to this court."); Marks v. Independence Blue Cross, 71 F. Supp. 2d 432, 434 (E.D. Pa. 1999) ("Before the court is the motion of IBC for summary judgment on the two ERISA claims."); Bowman v. Continental Cas. Co. of Chicago, No. 93-1060, 1999 WL 118001, at *4 (D. Conn. Mar. 4, 1999) ("The parties have submitted trial memoranda and exhibits for the Court's review. As the case is now fully briefed, the Court enters the following findings of fact and conclusions of law."); Haidle v. Chippenham Hosp., Inc., 855 F. Supp. 127, 128 (E.D. Va. 1994) ("This matter is before the Court on defendants' motions for summary judgment.").  In general, the Court will be able to undertake the fiduciary duty inquiry only after full discovery.  As a result, the Court will deny Magellan's motion on this ground without prejudice.  Magellan may renew this argument in a summary judgment motion at the

32

appropriate time.

### iii.  Effect of Magellan's Bankruptcy

Magellan argues that claims against Green Spring, Magellan Health Services, Inc., and

Magellan Behavioral Health, Inc. arising before January 5, 2004 are barred by Magellan's

bankruptcy discharge.[27]  A District Court may take judicial notice of bankruptcy proceedings.  See,

e.g., Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 416 (3d Cir. 1988) ("the

district court was entitled to take judicial notice of [the bankruptcy proceeding] in rendering its

decision"); MCI Worldcom Network Services, Inc. v. Graphnet, Inc., No. 00-5255, 2005 WL

1116163, at *9 (D.N.J. May 11, 2005) ("the Court first notes that at oral argument, it took judicial

notice of documents related to the WorldCom debtors' bankruptcy court proceedings").

Magellan's bankruptcy plan was confirmed by an order issued by the Bankruptcy Court for the

Southern District of New York on October 8, 2003.

> Pursuant to 11 U.S.C. § 1141(d)(1)(A),
>
> the confirmation of a [bankruptcy] plan . . . discharges the debtor from any debt that
> arose before the date of such confirmation . . . whether or not (I) a proof of the claim
> based on such debt is filed or deemed filed under section 501 of this title; (ii) such
> claim is allowed under section 502 of this title; or (iii) the holder of such claim has
> accepted the plan.

11 U.S.C. § 1141(d)(1)(A).  Consequently, the court's confirmation order states that,

> upon the Effective Date, all existing Claims against the Debtors . . . shall be . . .
> discharged and terminated, and all holders of Claims . . . shall be precluded and
> enjoined from asserting against the Reorganized Debtors . . . any other or further
> Claim . . . based upon any act or omission, transaction, or other activity of any kind

---

[27]     Magellan Behavioral Health of New Jersey, LLC did not file for bankruptcy and is
not affected by the other Magellan Defendants' bankruptcy.  The discussion in this section does
not apply to that entity.

> or nature that occurred prior to the Effective Date [of January 5, 2004], whether or
> not such holder has filed a proof of claim or proof of equity interest, and whether or
> not the facts of or legal bases therefor were known or existed prior to the Effective
> Date.

Quinn Cert. Ex. 3.  Claims such as those brought by Plaintiffs would constitute "debts" under the

Bankruptcy Code.  See 11 U.S.C. §§ 101(12) ("The term 'debt' means liability on a claim."),

101(5) ("The term 'claim' means . . . right to payment, whether or not such right is reduced to

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed,

legal, equitable, secured, or unsecured. . . .").  "The pivotal issue is the time at which the [party]

had a 'claim' . . . under ERISA."  CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension

Plan, Local 73, 162 F.3d 405, 406 (6th Cir. 1998).

    The Foley ERISA Plaintiffs argue that both their ERISA breach of fiduciary duty claims

and their non-ERISA common law breach of fiduciary duty claims did not arise until the plan

participants had knowledge of the breach.[28]  See Foley Opp. at 14.  Under ERISA,

> No action may be commenced under this subchapter with respect to a fiduciary's
> breach of any responsibility, duty, or obligation under this part, or with respect to a
> violation of this part, after the earlier of (1) six years after (A) the date of the last
> action which constituted a part of the breach or violation, or (B) in the case of an
> omission the latest date on which the fiduciary could have cured the breach or
> violation, or (2) three years after the earliest date on which the plaintiff had actual
> knowledge of the breach or violation;

29 U.S.C. § 1113.  The Third Circuit has explained that "where a claim is for breach of fiduciary

duty, to be charged with actual knowledge 'requires knowledge of all relevant facts at least

sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA

---

[28]    The Beye Complaint is limited to those claims which arose or accrued after Green
Spring, Magellan Health Services, Inc., and Magellan Behavioral Health, Inc. emerged from
bankruptcy on January 5, 2004.  See Beye Compl. at 6 n.1.  The Foley Complaint makes no
mention of the bankruptcy proceedings.

provision violated.'" Cetel v. Kirwan Financial Group, Inc., 460 F.3d 494, 511 (3d Cir. 2006) (citations omitted).

There is no question that, under Cetel, Plaintiffs had "actual knowledge" at the time their claims were denied, both of the facts that give rise to their breach of fiduciary duty claim, and that those facts might constitute a breach of § 502(a)(3) or some other section of ERISA.  As in Cetel, "[t]he totality of this information unequivocally demonstrates that plaintiffs were not only aware of all the material necessary to determine that defendants had [denied their benefits], but also that defendants' [denials] were suspect." Cetel, 460 F.3d at 511.  The ERISA Plaintiffs' claims accrued at the time Defendants denied their benefits.

As to the Foley non-ERISA Plaintiffs, in New Jersey, a claim for breach of fiduciary duty accrues "when 'the right to institute and maintain a suit first arose,' or more specifically, when the act or injury occurs." Estate of Parr v. Buontempo Ins. Services, 2006 WL 2620504, at *1-2 (N.J. Super. Ct. App. Div. Sept. 8, 2006) (quoting White v. Mattera, 814 A.2d 627 (N.J. 2003)).  New Jersey has also adopted the discovery rule, such that "'in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim.'" Id. (quoting Lopez v. Swyer, 300 A.2d 563 (N.J. 1973)).  Under the discovery rule the

> [C]rucial inquiry is 'whether the facts presented would alert a reasonable person exercising ordinary diligence that he [ ] was injured due to the fault of another. The standard is basically an objective one-whether Plaintiff 'knew or should have known' of sufficient facts to start the statute of limitations running.

Id. (quoting Szczuvelek v. Harborside Healthcare Woods Edge, 865 A.2d 636 (N.J. 2005)).  Even under the more permissive discovery rule, the non-ERISA Plaintiffs were alerted to their injury at

the time Defendants denied their claims for benefits.  Their claims therefore arose at the time their

benefits were denied.

     As a result, the Court will dismiss claims against Green Spring, Magellan Health Services,

Inc., and Magellan Behavioral Health, Inc. for benefits that were denied prior to January 5, 2004.

See, e.g., MCI Worldcom Network Services, 2005 WL 1116163 at *13 ("Thus, to the extent

defendant's Counterclaim and Third Party Complaint state claims that arose before [the discharge

Effective Date of] April 20, 2004, those claims are dismissed.") (citing 11 U.S.C. § 524(a)(2) ("[a]

discharge in a case under this title . . .operates as an injunction against the commencement or

continuation of an action, the employment of process, or an act, to collect, recover or offset any

such debt as a personal liability of the debtor, whether or not discharge of such debt is waived")).


## IV.  CONCLUSION

     For the reasons stated above, the Court will grant in part and deny in part Defendants'

motions to dismiss.  An appropriate order will issue.

                   /s/ Faith S. Hochberg           

                   **HON. FAITH S. HOCHBERG, U.S.D.J.**