<u>**FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RONALD DRAZIN, *et al.*, | : |
| | : |
| Plaintiffs, | : Hon. Faith S. Hochberg, U.S.D.J. |
| | : |
| v. | : Civil Case No. 06-6219 |
| | : |
| HORIZON BLUE CROSS BLUE SHIELD OF | : **OPINION** |
| NEW JERSEY, INC., *et al.*, | : |
| | : Date:  December 28, 2011 |
| Defendants. | : |

<u>**HOCHBERG, District Judge:**</u>

This dispute illustrates both the lofty side and the seamy side of the class action industry. It involves two of four related class actions filed in this District against insurance providers who had denied health insurance coverage for the treatment of eating disorders.  Both of the instant cases were filed against Horizon Blue Cross Blue Shield of New Jersey, Inc. ("Horizon") and Magellan Health Services, Inc. ("Magellan") (together, "Defendants"), and both alleged essentially identical claims on behalf of the identical class.  Despite their identity of issues, claims, parties, and classes, the two matters were filed separately by two attorneys who had been partners in the same firm; when that firm imploded, each filed the identical case on behalf of "his" Named Plaintiff and the same class.  Where there should have been a single case requiring the expenditure of judicial time and resources, there were two.  The matters were not consolidated because of the extreme hostility between the warring attorneys' respective new

1

firms: Nagel Rice, LLP ("Nagel Rice") and Mazie Slater Katz & Freeman, LLC ("Mazie Slater").

The case litigated by Nagel Rice ultimately settled on terms that provided class members with very valuable relief. The case litigated by Mazie Slater was not settled. The settlement secured by Nagel Rice was approved by the Court and virtually all members of the class joined the settlement. Left with no class, Mr. Mazie dismissed his case. He found nothing objectionable about the settlement filed by Mr. Nagel, except that he wanted a piece of the attorneys' fee. The venom between these two attorneys was so strong that the absence of any objection by Mr. Mazie to the substance of Mr. Nagel's settlement speaks eloquently that it was fair and in the best interests of the class suffering from eating disorders. Presently before the Court are applications from both firms for an award of attorneys' fees and costs. This Court permitted extensive briefing[1] and an evidentiary hearing on the fee petitions to permit each firm to file documentation in the record in support of its position.

## I. <u>BACKGROUND</u>

In October 2006, Bruce Nagel, Esq., was contacted by the parent of a patient afflicted with an eating disorder who wished to file a class action lawsuit against her insurance carrier for denials of coverage. After investigating potential causes of action and consulting with experts, Nagel Rice filed one of the instant actions, *Drazin v. Horizon* (06-cv-6219) (the "*Drazin* action"), on December 26, 2006. Nagel Rice also filed suit against Aetna on January 26, 2007. *DeVito v. Aetna* (07-cv-418) (the "*DeVito* action"). The gravamen of Plaintiffs' claims in both cases was that the defendant insurance provider improperly denied Plaintiffs coverage for eating disorder treatment by improperly classifying eating disorders as "non-Biologically Based Mental

---

[1] Each of the firms was permitted to file an extraordinary four briefs in support of its position, and in opposition to the other firm's position, on the allocation of attorneys' fees.

Illnesses" ("non-BBMIs").  Plaintiffs alleged that the insurance providers' treatment of eating disorders as non-BBMIs improperly limited the amount of coverage to which they were entitled under their policies.  Plaintiffs sought damages based upon past denials of coverage, and injunctive relief to alter the business practices relating to non-BBMI coverage limitations. Plaintiffs' claims were brought under ERISA for those insureds with ERISA plans and under New Jersey's Parity Law and the New Jersey Consumer Fraud Act, for those insureds with non-ERISA plans.

At substantially the same time, the identical action against Horizon on behalf of the same class was filed by David Mazie, Esq.  *Beye v. Horizon* (06-cv-5337) (the "*Beye* action").  At the time, Messrs. Nagel and Mazie were embroiled in a bitter dispute over the dissolution of their law firm partnership, then known as Nagel Rice & Mazie LLP.  In September 2006, Mr. Mazie had been asked to leave the partnership.  The *Beye* action was filed by Mr. Mazie during a "phase-out" period before Mr. Mazie started his own firm, Mazie Slater, in January 2007.

Prior to the filing of the *Beye* and *Drazin* actions, Mr. Nagel wrote to Mr. Mazie suggesting that they work together on the case against Horizon.  *See* Ex. H to Nagel Cert. (Docket # 269-1) ("I think we should avoid a fight and jointly do this case.").  Mr. Mazie declined Mr. Nagel's invitation for cooperation, and countered by threatening Mr. Nagel with a lawsuit for "tortiously interfering" with his purported "right" to be lead counsel in the Horizon litigation.  Nagel Cert. ¶ 9 (Docket # 269-1).

Because of this intense, palpable hostility between Messrs. Mazie and Slater, the *Beye* and *Drazin* actions against Horizon were filed as two separate cases.  The result was an enormous and unnecessary duplication of work and expense as the two firms litigated the same case in parallel actions.  Judicial economy took a back seat to the law firm war.  The time of this

Court and Magistrate Judge Shwartz was wasted on spurious motions, some of which were really just warfare tactics between law firms.  Mr. Nagel testified that in his estimation, "you could have cut that [work] literally in half" had there been greater coordination between the two law firms.  In his view, "there was no need to do . . . duplicative work, duplicative experts, duplicative fees."  *Drazin* 10/7/09 Tr. 31-32; *see also* Nagel Rice Opp. 9 (Docket # 284-2) (the lack of cooperation "resulted in duplicative, costly and unnecessary work and was extremely harmful to the progress of the case").  Numerous disputes between Nagel Rice and Mazie Slater arose because of the duplication of efforts.  For example, the two firms battled over who "owned" certain experts that both had retained; at one point, Mazie Slater demanded that Nagel Rice "cease and desist from contacting" its experts.  *See* Exs. I-L to Nagel Cert. (Docket # 269-1).  The firms also wrestled over who would take the lead at which depositions.  *See* Ex. N to Nagel Cert. (Docket # 269-1).  There was also an absurd fight about which attorney had "publicity rights" in the case.  Aspects of the docket and transcript in this trio of cases[2] became textbook examples of what happens when certain attorneys seemed to forget that their clients were the litigating parties, and not themselves.

In order to protect third parties from burdensome duplicative depositions and other discovery demands, Magistrate Judge Shwartz ordered that there be some cooperation between the two firms during the pretrial period.  The extent of that cooperation is fiercely contested. *Compare* Nagel Rice Opp. 9 (Docket # 284-2) (Mazie Slater "elected to litigate the *Beye* case with utmost secrecy and elected not to share the experts, theories, damage analysis, or any other material aspect of their work product"), *with* Mazie Slater Reply 4 (Docket # 287) ("We routinely cooperated with Nagel Rice on all aspects of discovery, sharing our strategy, our

---

[2]  The two cases herein, the *Beye* and *Drazin* actions, as well as the separately filed *DeVito* action.

4

experience and our sophisticated and unique product."). It is clear from the firms' billing records that Beth Baldinger of Mazie Slater and Randee Matloff of Nagel Rice were in frequent contact, exchanging over 1000 emails during the litigation. Baldinger Cert. ¶ 5 (Docket # 287-1). It is also clear that the time they spent "coordinating" might well have been entirely unnecessary had the two cases been litigated as one case from the outset. The fact that they were not is solely attributable to the distasteful war that the two firms waged against each other; this Court's need to endure the waste of time and ugly incivility was a casualty of this war.

At the end of the day, the clients benefitted from a highly valuable settlement negotiated by Nagel Rice that secured important protections for those suffering from eating disorders now and in the future. On November 18, 2008, Nagel Rice and Defendants notified the Court that they had reached a settlement in the *Drazin* action (the "Class Settlement"). The Class Settlement was modeled on the settlement achieved by Nagel Rice in the *DeVito* action against Aetna,[3] with certain alterations. It provided for approximately $1.2 million in reimbursements for past denied claims based upon non-BBMI policy limitations, parity status for eating disorder treatment in the future, and the option for certain class members to elect review by an eating disorder specialist to resolve disputes arising from the denial of claims for eating disorder treatment based upon determinations about medical necessity. The Defendant insurers, Horizon

---

[3] The settlement in *DeVito*, finally approved by this Court in October 2008, provided for Aetna's reimbursement of past denied claims based upon coverage limitations applicable to non-BBMIs; Aetna's agreement to not apply any limitations of coverage applicable to non-BBMIs to any claim for treatment of eating disorders; and the option for certain class members to elect review by an independent eating disorder specialist to resolve disputes arising from denials of claims based on medical necessity determinations.

and Magellan, also agreed not to object to the payment of up to $2.45 million in attorneys' fees and costs.[4]

The Class Settlement was the result of five months of extensive and arduous arms-length negotiations between Nagel Rice and counsel for Defendants.  Mazie Slater was not asked to enter these negotiations by either side.  As Philip R. Sellinger, Esq., counsel for Defendant Horizon explained, the decision to negotiate with Nagel Rice rather than Mazie Slater was a "pragmatic one."[5]  Horizon Br. 4 (Docket # 244).  First, Mr. Nagel approached Defendants to discuss settlement, whereas attorneys from Mazie Slater did not.  Second, counsel for Horizon was keenly aware that "the Mazie firm and Nagel Rice cannot play nice in the sandbox," and felt that inviting Mazie Slater to join settlement negotiations "would prove disastrous to the settlement process."  *Id*.; *see also Drazin* 10/7/09 Tr. 19 (Mr. Nagel: "I thought it was in the worst interest of the class . . . to engage [Mazie Slater] in the negotiations. . . .  These cases could not be tied up in . . . fighting among potential plaintiffs' counsel.").  Finally, Mr. Nagel had already developed a successful framework for settlement in the *DeVito* action, which was found by this Court to be fair, reasonable, and adequate.  Although Mazie Slater did not represent any member of the *DeVito* class, Mazie Slater had opposed preliminary approval of the *DeVito* settlement in defamatory language, calling the settlement "woefully inadequate," "patently unfair," and "nothing short of a sham – a sweetheart deal designed to get the Nagel Rice firm a

---

[4]  As discussed below, any attorneys' fee award will be paid by Defendants separate and apart from the Class's recovery.

[5]  Mazie Slater contended that Horizon cut it out of the settlement negotiations because it had several lawsuits pending against Horizon; a theory that Mr. Sellinger described as "narcissistic" and "fantastic," given that Nagel Rice also had several suits pending against Horizon at the time.  Horizon Br. 4 n.3 (Docket # 244).

fee in turn for selling out the class."[6]  Letter to Court from Mazie Slater dated 6/2/08 (attached as

Ex. E to Nagel Cert. (Docket # 269-1)).  Indeed, Eric Katz, Esq., a partner at Mazie Slater,

appeared at the *DeVito* preliminary approval hearing despite having no client with standing in

that case, and, with gestural theatrics, lambasted the settlement as a "very poor settlement" and

certainly not one that he would ever even consider.  *DeVito* 6/24/08 Tr. 56.  As counsel for

Horizon noted, "Mr. Katz made it quite clear that any efforts to negotiate a similar settlement

with his clients in the [*Beye* action] would be fruitless, stating that he 'would never settle the

*Beye* case on those terms.  Never, ever.'"[7]  Horizon Br. 4 (Docket # 244) (quoting Mr. Katz in

*DeVito* 6/24/08 Tr. 56 ("I can say for the record now, I would never settle the *Beye* case on these

terms.  Never, ever.")).

By Order entered November 25, 2008, Magistrate Judge Shwartz granted Mazie Slater

leave to file an application for appointment as lead counsel if they decided not to support the

Class Settlement and wished to continue litigating.  In the midst of the proceedings to approve

the Class Settlement negotiated by Nagel Rice, Mazie Slater filed a "Motion To Enforce

Settlement [of a purported side deal involving a publicity and fee battle between the firms] . . . ."

By this motion, Mazie Slater sought this Court's enforcement of a side deal (purporting to

resolve what was dubbed the "Attorney Fee/Publicity battle" at oral argument on January 7,

---

[6]  These accusations against the honorable counsel in the *DeVito* action were entirely
unfounded, and it is shameful that they were made against fine lawyers on both sides of that
case.

[7]  Notably, despite this vehement opposition, Mazie Slater did not file an objection to the
final *DeVito* settlement, suggesting that Mazie Slater's criticisms of that settlement were rooted
more in a desire to undermine Nagel Rice's negotiated settlement than to protect the class from
an inadequate settlement.

2009) that the two law firms had been negotiating with the help of a state court mediator.[8]  This

Court had neither involvement in nor jurisdiction over that side battle.  Mazie Slater also filed a

"Cross-Motion" to add the *Beye* Plaintiffs as class representatives and to strike a provision from

the Class Settlement which it called an "unconstitutional hammer clause."[9]

On December 23, 2008, Magistrate Judge Shwartz terminated Mazie Slater's "Motion To

Enforce" and "Cross-Motion."  The next day, Mazie Slater filed a letter motion that was

shocking: Mazie Slater sought an "indefinite" adjournment of preliminary approval of the Class

Settlement that would have stalled its own clients' insurance coverage remedy for their medical

treatment until after the warring law firms could resolve their fee and publicity rights dispute.[10]

---

[8]  With the assistance of Hon. Mark Epstein (Ret.), Nagel Rice and Mazie Slater had met on November 24, 2008 to discuss the possibility of the *Beye* Plaintiffs joining a class settlement in the *Drazin* action.  These discussions centered on incentive award payments for the named Plaintiffs in the *Beye* action, the apportionment of an award of attorneys' fees and costs between the two firms, and "publicity rights."  This possible side deal was not consummated.

[9]  The so-called "unconstitutional hammer clause" in ¶ 9.4 of the Class Settlement states: "Within sixty (60) days after the Effective Date, Horizon shall dismiss with prejudice its counterclaims in the *Beye* Action only if the Representative Plaintiffs Beye and Byram do not opt out of this Settlement and do not submit objections to this Settlement."  Mazie Slater initially argued that this clause was an unconstitutional denial of due process, but later abandoned that argument.  In any event, this provision is hardly unusual, stating in essence that counterclaims for insurance fraud will be dropped if a settlement is reached with Ms. Beye and Ms. Byram but will continue if the two plaintiffs continue their litigation against the insurer.  To demand that the counterclaim be dismissed even if the main claim was not settled was a baseless position and calling it an "unconstitutional hammer clause" was an effort to use vitriol to strengthen a weak position.  Vitriol is not a substitute for thoughtful research and writing.

[10]  Mr. Mazie later conceded that his firm's attempt to postpone approval of the Settlement in order to pursue its own benefit "was too aggressive [and] wrong given the circumstances," and that the requested adjournment "would have hurt the class."  *Drazin* 10/7/09 Tr. 113, 117.  This serious lapse in judgment has not been factored into the Court's analysis of the fee applications presented here, but is described only to illustrate the regrettable loss of judgment and professionalism caused by the extreme hostility between Mazie Slater and Nagel Rice.

The request for adjournment of the preliminary approval of the Class Settlement was denied and preliminary approval was granted.

The Court scheduled the final fairness hearing to occur on April 21, 2009.  Mr. Mazie asked a state court judge to call this Court with a request to adjourn the final fairness hearing, where Mr. Mazie wished to argue for counsel fees, so that a state trial would not be interrupted by Mr. Mazie's attendance at the final fairness hearing.  This would have again stalled his own clients' financial recovery, so this Court did not adjourn the final fairness hearing.  In order to accommodate Mr. Mazie, this Court agreed to adjourn the portion of the final fairness hearing relating to the applications for attorneys' fees.  At the final fairness hearing Mr. Katz appeared for Mazie Slater.

Of the 566 Class Members, only 2 opted-out and none objected.  Mazie Slater did not object to final approval of the Class Settlement.  Rather, Mr. Katz explicitly stated his firm's support for the Settlement.  *Drazin* 4/21/09 Tr. 25 (Mr. Katz:  "[Mazie Slater] has no objection and we support the settlement.").  Yet, in its papers and arguments to the Court, Mazie Slater frequently maligned the Class Settlement as the product of a "reverse auction," implying that Nagel Rice sold out class members.  *See, e.g.*, Mazie Slater Br. 12 (Docket # 268); *see also, generally*, *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Litig.*, 55 F.3d 768, 788 (3d Cir. 1995) (describing practice whereby "attorneys jockeying for position might attempt to cut a deal with the defendants by underselling the plaintiffs' claims relative to other attorneys"); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (in a reverse auction, "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with the hope that the district court will approve a weak settlement that will preclude other claims against the defendant").  If Mazie Slater truly believed that a "reverse auction" had

9

occurred, or that the Class Settlement was otherwise unfair, it had a duty to object to approval of the Class Settlement. Mazie Slater did not do so; rather, it expressly stated, on the record, its support for final approval of the Settlement.[11] The Court granted final approval of the Class Settlement, finding it to be fair, adequate, and reasonable.

Mazie Slater filed a stipulation of dismissal in the *Beye* action: the firm had no client and no class left who wished to continue to litigate, and Mazie Slater folded its tent. The Class Settlement was implemented for the benefit of the members who suffer from eating disorders.

The attorney fee dispute then flared. In addition to the two law firms' briefs and appendices on the attorney fee issue that had already been filed with this Court, it permitted two further briefs per side to be submitted and held a full evidentiary hearing on the requests for attorneys' fees by both law firms.

## II. DISCUSSION

Now before the Court are Nagel Rice's and Mazie Slater's applications for attorneys' fees and costs. Nagel Rice seeks an award of $2.45 million, the maximum amount payable under the Class Settlement. Mazie Slater seeks an allocation of at least 50% of any counsel fee awarded to Nagel Rice, as well as reimbursement of all of its litigation expenses. Nagel Rice opposes any award to Mazie Slater, arguing that Mazie Slater is not entitled to fees under the applicable case law. The two firms disagree over what method(s) the Court should use to award

---

[11] The accusation of a "reverse auction" has no place in this case, where the Settlement represents one of the lofty purposes of class actions. The use of the term is an illustration of the sound and fury that has plagued these cases, in those instances where the inter-firm battle eclipsed the duty of service to clients and the profession. Such language, by implication, defames honorable attorneys who, on behalf of the Class and Defendants, spent months in arms-length negotiations to settle this case and achieve important rights for the Class. Mazie Slater's earlier accusations regarding the *DeVito* settlement ("a sham – a sweetheart deal designed to get the Nagel Rice firm a fee in turn for selling out the class") likewise undeservedly defamed the honorable attorneys who negotiated that settlement. The term "reverse auction" shall never again be used to deride the good work of many good lawyers who worked on this case.

and allocate any fee award, and challenge line-items in each other's billing records.  They have filed multiple briefs and submitted volumes of documents in support of their respective positions. The Court also heard testimony from Messrs. Nagel and Mazie at an evidentiary hearing on the fee issue.

Nagel Rice argues that this is a statutory fee-shifting case, as it was brought primarily pursuant to ERISA.  Mazie Slater maintains that this is a common fund case, because the Settlement produced a fund from which Class Members' claims will be paid.  While the distinction has historically informed the fee analysis to some extent; it does not alter the outcome here.  Nonetheless, the Court will briefly review the considerations underlying fee awards in statutory fee and common fund cases.

### A.   Fee Awards in Common Fund And Statutory Fee Cases

Traditionally, litigants in the United States have borne their own legal fees.  However, two well recognized exceptions to this "American Rule" have developed.  The first exception arises in cases brought under statutes that authorize payment of attorneys' fees by one party to the party that prevailed.  Such statutory fee-shifting provisions "encourage private enforcement of the statutory substantive rights, whether they be economic or noneconomic, through the judicial process." *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 250 (Oct. 8, 1985) [hereinafter, "*Report of the Third Circuit*"]; *see also Ruckelshaus v. Sierra Club*, 463 U.S. 680, 684 (1983) (noting the existence of over 150 federal fee-shifting provisions).

The second major exception is the common fund doctrine.  This century-old doctrine, rooted in equity, "allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed

from that fund for litigation expenses incurred." *Report of the Third Circuit*, 108 F.R.D. at 241.

This doctrine is meant to prevent the unjust enrichment on the part of beneficiaries of a fund at

the expense of the litigants and their attorneys who helped create it. *Trustees of the Internal

Improvement Fund v. Greenough*, 105 U.S. (15 Otto) 527 (1882); *see also Boeing Co. v. Van

Gemert*, 444 U.S. 472, 478 (1980) (explaining that common fund doctrine "rests on the

perception that persons who obtain the benefit of a lawsuit without contributing to its cost are

unjustly enriched at the successful litigants' expense").

      Under the common fund doctrine, the plaintiff class as a whole rather than the defendant

bears the burden of attorneys' fees.  Under statutory fee provisions, only a litigant that has

achieved some success on the merits is entitled to a fee.

      While the choice of methodology is ultimately within a court's discretion, courts

generally regard the lodestar method as most appropriate for statutory fee-shifting cases.[12]  *See

In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir. 2001).  "Because the lodestar

award is de-coupled from the class recovery, the lodestar assures counsel undertaking socially

beneficial litigation (as legislatively identified by the statutory fee shifting provision) an

adequate fee irrespective of the monetary value of the final relief achieved for the class."  *In re

General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir.

1995) [hereinafter, "*GMC Litig.*"].  Also, "[o]utside the pure statutory fee case, the lodestar

rationale has appeal where . . . the nature of the settlement evades the precise evaluation needed

for the percentage of recovery method."  *Id.*

---

    [12]  "[A] court determines an attorney's lodestar by multiplying the number of hours he or
she reasonably worked on a client's case by a reasonable hourly billing rate for such services
given the geographical area, the nature of services provided, and the experience of the lawyer."
*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).

Attorneys' fees under the common fund doctrine may be calculated using the lodestar method, but more frequently are awarded using the percentage-of-recovery method, which awards a fee based on a percentage of plaintiffs' recovery. *See GMC Litig.*, 55 F.3d at 819 n.38 ("The percentage of recovery method resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class."). "Because [common fund] cases are not presumed to serve the public interest (as evidenced by the lack of a fee statute), there is no social policy reason that demands an adequate fee. Instead, the court apportions the fund between the class and its counsel in a manner that rewards counsel for success and penalizes it for failure." *Id.* at 821. When considering a fee request from non-class counsel in a common fund case, the court must focus its inquiry "on the essential consideration, the benefit to the class, not the amount of time expended." *Milliron v. T-Mobile USA Inc.*, 423 Fed. Appx. 131, 135 (3d Cir. 2011). The percentage-of-recovery is usually then "cross-checked" against the lodestar, to ensure that the fee is reasonable and appropriate.

### B. The Instant Fee Applications

The instant matters were filed primarily pursuant to ERISA, which contains a fee-shifting provision.[13] *See* § 29 U.S.C. 1132(g)(1). Although the Class Settlement created, *inter alia*, a

---

[13]  For the first time in its fourth brief on the issue, Mazie Slater notes that the Complaints also pled state law claims on behalf of a subset of class members with non-ERISA health insurance policies. Mazie Slater contends that such claims are not subject to a fee-shifting statute, and therefore any fee awarded in connection therewith should not be analyzed using the fee-shifting model. However, Mazie Slater has not, in any of its voluminous papers, nor in the four briefs it filed on the fee allocation issue, nor in the evidentiary record developed at the fee hearing, ever even attempted to quantify the number of non-ERISA class members; nor attempted to make an allocation among that small subset of non-ERISA class members. The record will not be re-opened at this late date for new evidence where none was adduced during the already excessive time spent on this issue by this Court. Moreover, the non-ERISA claims brought under the New Jersey Consumer Fraud Act are subject to that statute's fee-shifting provision. *See* N.J.S.A. 56:8-19. Therefore even the non-ERISA claims are primarily, if not entirely, subject to fee-shifting principles.

common fund from which Class Members can recover past denied claims, a separate fund was established for the potential payment of attorneys' fees.  That fund was not "carved out" of the Class recovery fund, which was pronounced fair and proper in its amount by both warring counsel.  The separate attorneys' fee fund was funded by Defendants Horizon and Magellan in recognition of the fact that this is inherently a fee-shifting case, and this Court agrees with that characterization.[14]  Moreover, even if a common fund had been created, that "does not mean that the common fund doctrine must be applied in awarding attorney's fees."  *Brytus v. Spang & Co.*, 203 F.3d 238, 244 (3d Cir. 2000); *see also Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 45 (2d Cir. 2000) (holding that either the lodestar or percentage of the fund methods may be used to calculate attorneys' fees in common fund cases).  Rather, the common fund doctrine may be appropriately used, in the Court's discretion, where there is a reason to grant equitable relief; specifically, where there is a risk of unjust enrichment by the beneficiary.  *See Brytus*, 203 F.3d at 245 ("[W]e consider primarily whether the circumstances of this case present an inequity that needs redress, which is the typical situation for application of the common fund doctrine.").  Because of the structure of the Class Settlement, there is no such risk here.

Under the terms of the Class Settlement, any award of fees will not be paid out of the fund established to benefit the Class; rather, the award will be paid by Defendants separate and

---

Regarding those claims brought under New Jersey's Mental Health Parity Law, this Court has twice expressed doubt as to whether that statute provides a private right of action.  *See Beye v. Horizon Blue Cross Blue Shield of New Jersey*, 568 F.Supp.2d 556, 570-73 (D.N.J. 2008); *DeVito v. Aetna*, 536 F.Supp.2d 523, 529 (D.N.J. 2008).

[14]  *See Brytus v. Spang & Co.*, 203 F.3d 238, 248 (3d Cir. 2000) (in cases "which share the attributes of both a statutory fee case and a common fund case, it is within the district court's discretion to make a particularized determination as to whether the case 'more closely resembles' a common fund case or a statutory fee case") (quoting *GMC Litig.*, 55 F.3d at 822); *see also McLendon v. Continental Group, Inc.*, 872 F. Supp. 142, 151 (D.N.J. 1994) (recognizing the discretionary nature of the decision).

apart from the Class's recovery, and subject to an agreed-upon cap.  If the Court does not award

the full amount of the cap, the remainder does not revert to the Class.  Therefore the award is not

coming from a fund that would otherwise "unjustly enrich" class members.  *Accord Green v.*

*City of New York*, 2009 WL 3063059, at *7 (E.D.N.Y. Sept. 21, 2009) ("Since the Settlement

envisions that defendants, not the lead plaintiffs, will fully compensate class counsel, the class

plaintiffs will not be unjustly enriched if class counsel is not awarded a portion of their [fund].");

*see also Cendant Corp. PRIDES Litig.*, 243 F.3d at 734 (characterizing case as not a traditional

common fund because "unclaimed portion of the settlement fund is returned to [defendant]" and

"plaintiffs who recover may not be affected by attorneys' fee award").[15]

Employing the fee-shifting model's lodestar is the method most appropriately tailored to

the circumstances of this case.  The class settlement achieved insurance coverage and a

methodology to vastly improve the class members' coverage for eating disorder treatments.

Equally valuable are the significant business changes that Defendants have agreed to implement.

For example, Defendants agreed to cease applying the limitation of coverage for non-BBMIs in

determining payment of benefits for the treatment of eating disorders and also agreed to modify

and enhance the appeals procedure with respect to medical necessity denials of coverage,

including review by an eating disorder specialist.  This is a key provision, because it guarantees

---

[15]  The Settlement here is distinguishable from the "common situation . . . where a statutory fees case settles for an amount meant to extinguish all claims against the defendant, including claims for attorneys' fees."  *McLendon*, 872 F. Supp. at 152 (citing *Third Circuit Report*, 108 F.R.D. at 255).  In these cases, the defendant agrees to create a single settlement fund in exchange for release of the defendant's liability both for damages and for statutory attorneys' fees.  In such circumstances, equitable fund principles must govern as "[s]tatutory fees are no longer available because of the way the settlement is structured, and plaintiffs would be unjustly enriched at the expense of their counsel if plaintiffs were permitted to retain the entire fund."  *Green*, 2009 WL 3063059, at *7; *see also In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 583 (3d Cir. 1984) ("settlements releasing defendants from both damage and statutory fee liability . . . result in a fund in court from which fees can be awarded under the equitable fund doctrine").

that a specialist, and not a general claims reviewer, will decide these nuanced questions. Such business changes are not easily quantifiable in pure dollar terms, making a percentage award difficult to calculate. *See GM Litig.*, 55 F.3d at 822 ("the court may select the lodestar method . . . where it can calculate the relevant parameters (hours expended and hourly rate) more easily than it can determine a suitable percentage to award"). The fee-shifting paradigm will therefore be applied to counsel's respective fee applications.

Turning to those applications, the fee-shifting provision permits a party to recover "reasonable attorney's fees and costs of action." 29 U.S.C. § 1132(g)(1); *see also* N.J.S.A. 56:8-19. The Supreme Court recently clarified that a fee claimant "need not be a 'prevailing party' to be eligible for an attorney's fees award under this provision," but must "show some degree of success on the merits before a court may award attorney's fees." *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2156, 2158 (2010) (quotations omitted). "A claimant does not satisfy that requirement by achieving 'trivial success on the merits' or a 'purely procedural victor[y],' but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question of whether a particular party's success was 'substantial' or occurred on a 'central issue.'" *Id.* (quoting *Ruckelshaus*, 463 U.S. at 688 n.9).

Here, Nagel Rice negotiated a settlement that unquestionably achieved "some degree of success on the merits." It secured a valuable judgment for Class Members in the form of the Class Settlement, which favorably resolved all of the Plaintiffs' core claims and provided Class Members with the exact relief they originally sought: payment for past denials, removal of coverage limitations, and other important business changes by Defendants to make future coverage more fairly and knowledgeably evaluated in the insurers' internal claims review

16

process.  Nagel Rice alone developed the "template" for the Settlement and engaged in months of arms-length negotiations with Defendants' counsel to achieve this result for the class. Following the negotiations, Nagel Rice and Defendants' counsel drafted the Class Settlement Agreement, presented it to the Court for approval, and secured a judgment enforcing its terms. Nagel Rice is entitled to an award of attorneys' fees.[16]

Nagel Rice, as counsel for the party achieving "some degree of success," is entitled to "reasonable attorneys' fees," as measured by counsel's lodestar.  Because of the exceptionally voluminous nature of counsel's time records – which were compounded by the inter-law firm battle – the Court will appoint a Special Master to calculate the lodestar and report findings to this Court in accordance with the following guidelines:  First, consistent with this Court's duty to exclude from the lodestar "hours that were not reasonably expended," the Special Master shall review Nagel Rice's billing records and exclude those hours that were "excessive, redundant, or otherwise unnecessary."  *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).  Time that was incurred because Nagel Rice and Mazie Slater litigated duplicative cases in parallel shall be excluded because it was incurred as a direct result of law firm warfare and did not confer a benefit on the Class.  For example, hours expended coordinating the two separate cases (exemplified by the hundreds of phone calls and a thousand emails between counsel at the two firms), and time spent battling with each other (about, for instance, who would take the lead on which depositions), shall be omitted.  After the Court reviews the Special Master's report and decides the lodestar amount, it will decide if any multiplier upwardly adjusting Nagel Rice's

---

[16]  Neither Nagel Rice nor Mazie Slater conducted an analysis of the *Ursic* factors, and therefore each law firm has waived any future argument based upon the application of such factors.  The Court notes, however, that the method used in this Opinion for awarding attorneys' fees has incorporated consideration of the factors.  *See Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983).

lodestar is warranted.  No additional evidence outside the existing voluminous record will be presented to the Special Master.

Mazie Slater's fee application sits in a very different posture.  Mazie Slater litigated its duplicative *Beye* action parallel to the *Drazin* action and did not succeed in its efforts for the Class: "effort" is not the same as "success."  Mazie Slater did not win a dispositive motion, nor win its case, nor negotiate a settlement for its clients in the *Beye* action.  Its attorneys had emphatically pronounced that they would "never, ever" agree to a settlement based on the prior *DeVito* template.  Such intransigence led to this outcome.[17]  Mazie Slater did not proceed to litigate the *Beye* matter to completion even through it surely could have; rather, it decided to dismiss that action with prejudice after the Class Settlement was finally approved and its class abandoned it.  Mazie Slater became a law firm with neither a client nor a class.  In short, Mazie Slater did not achieve "some degree of success" on the merits, and is therefore not entitled to fees under a fee-shifting analysis.  *See Hardt*, 130 S. Ct. at 2152.

---

[17]  Mazie Slater complains that it was "improperly excluded" from the "surreptitious" and "stealthy" settlement negotiations between Nagel Rice and counsel for Defendants.  However, as described in detail above, Nagel Rice's and Defendants' decision to negotiate without Mazie Slater was both pragmatic and appropriate.  As Mr. Sellinger sensibly explained, Mr. Katz's vituperative railing against the *DeVito* settlement convinced Defendants to not waste their efforts on negotiations with Mazie Slater.

Mazie Slater also argues that despite its exclusion from the settlement process, Nagel Rice and Defendants incorporated into the Class Settlement "key recommendations" that Mr. Katz raised during the *DeVito* settlement approval process.  Mr. Nagel credibly testified that these changes were being discussed long before Mr. Katz raised them at the hearing.  It is an overstatement to credit Mazie Slater with originating these ideas.  Mr. Katz's litany at the *DeVito* hearing was not particularly comprehensible, and, in any event, the changes were hardly novel.  If Counsel wishes to participate in developing a good settlement, it needs to think about its tone and behavior throughout the case.

Most important is that Mazie Slater does <u>not</u> contend that its absence from the bargaining table produced a "cheap" or "unfair" or "defendant-friendly" settlement: it said exactly the opposite at the Final Fairness Hearing.

Mazie Slater argues that the Court should apply "common fund principles" to the attorneys' fee fund and divide the awarded fee based on counsel's time and effort in the litigation, rather than apply the *Hardt* "fee-shifting" analysis.  Mazie Slater contends that common fund principles entitle it to an allocation of at least 50% of any fee awarded to Nagel Rice.  In support of this position, Mazie Slater relies most heavily on *Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d 797 (E.D. La. 2008), a mass tort case litigated in a United States District Court in Louisiana.[18]  Unlike *Turner*, this Court had two separate cases managed by two law firms.  The two law firms operated as separate  and, at times, opposing teams.  Despite its declarations of coordination and cooperation, Mazie Slater recognized that two teams litigated two separate cases here.  In its papers, Mazie Slater repeatedly described the two law firms as "competing," *see, e.g.*, Mazie Slater Br. 2 (Docket # 298), and observed that "this was not one case, but two separate cases joined for discovery purposes – with different plaintiff law firms handling each case as they thought best[.]"  Mazie Slater Reply 4 (Docket # 287).  The two firms employed different strategies in their respective cases.  After motion practice and discovery, Nagel Rice approached Defendants to negotiate a settlement that ultimately achieved a valuable result for the Class without the attendant risks of continued litigation.  Mazie Slater eschewed the idea of settlement in vehement terms until the very end, when it finally conceded that Nagel Rice's settlement was in the best interests of the Class.  After Mazie Slater dismissed its

---

[18]  In that case, the court appointed a Special Master to allocate a fee award among 43 attorneys, all of whom had been appointed to a plaintiffs' steering committee.  *Turner*, and other cases like it involving multi-district and consolidated litigation, is not analogous to the situation here.  This is not a "common fund case," where the attorneys' fee is taken from the recovery fund.  But even if it were such a case, *Turner* is not analogous.  In *Turner* there was a single team of plaintiffs' attorneys working together for the management of the litigation.

litigation, the war ended on one front, and then bivouacked to the attorney fee battlefield.  The

"common fund principles" advanced by Mazie Slater are not a good fit for this case.[19]

However, even if this Court were to apply common fund principles under the *Cendant*

*II/Milliron* test, Mazie Slater has not demonstrated an entitlement to fees.[20]  Mazie Slater did not

meet its burden at the evidentiary hearing to prove that its time and efforts achieved a successful

---

[19]  Even in common fund cases, the fee allocation approach advanced by Mazie Slater—to reward the efforts of each firm—is not the preferred approach in the Third Circuit.  Rather, in the Third Circuit, "[w]hen awarding fees to non-lead counsel, '[o]nly work that <u>actually confers a benefit</u> on the class will be compensable,'" *Milliron*, 423 Fed. Appx. at 134 (emphasis added) (citing *In re Cendant Corp. Sec. Litig.* [hereinafter, *"Cendant II"*], 404 F.3d 173, 197 (3d Cir. 2005)).  In *Cendant II*, an action brought under the Private Securities Litigation Reform Act ("PSLRA"), the Third Circuit held that in order to receive compensation, "[n]on-lead counsel will have to demonstrate that their work conferred a benefit on the class *beyond* that conferred by lead counsel."  404 F.3d at 191 (emphasis in original).  Mazie Slater argued that this holding is limited to PSLRA actions.  However, *Milliron* and recent decisions by district courts within this circuit demonstrate that the *Cendant II* "independent benefit" analysis applies in non-PSLRA cases as well.  *See e.g.*, *Larson v. Sprint Nextel Corp.*, No. 07-cv-5325(JLL), 2010 WL 234934, at *28-35 (D.N.J. Jan. 15, 2011); *Lan v. Ludrof*, No. 06-cv-114(SJM), 2008 WL 763763, at *27-29 (W.D. Pa. Mar. 21, 2008).  In *Milliron*, the Third Circuit stated that even in common fund cases, the "inquiry correctly focused on the essential consideration, the benefit to the class, not the amount of time expended."  *Id.* at 135; *see also Larson*, 2010 WL 234934, at *32-33 ("[o]nly those attorneys who confer an independent benefit upon the class will merit compensation," and "the effectiveness of counsel is measured by *results*—not by the number of depositions taken, pleadings filed, or motions briefed") (emphasis in original) (internal quotations omitted).

[20]  Despite submitting four briefs and mountains of exhibits to support its claim for half of the fees, Mazie Slater has been unable to clearly articulate any independent benefit that it conferred on the *Drazin* class.  The significance of several of Mazie Slater's claimed contributions is disputed by the Defendants, and the Court finds that the remaining claimed contributions do not amount to an independent benefit deserving of a fee allocation.  For example, Mazie Slater claims that it was "the **only** firm to procure and serve damages expert reports based on the claims data," Mazie Cert. ¶ 7 (Docket # 268-2) (emphasis in original).  Nagel Rice counters that it did not rely upon these expert reports during its settlement negotiations as it relied on the analysis of its own expert.  Indeed, two of Mazie's expert reports were served <u>after</u> the settlement had already been announced.  Nagel Cert. ¶ 2(v) (Docket # 284).  Mazie Slater claims that it arranged for and took the "significant deposition" of Dr. Brandt, a key witness on the issue of whether eating disorders are BBMIs.  Mazie Cert. ¶ 7 (Docket # 268-2).  However, Nagel Rice discovered Dr. Brandt through the deposition of another witness.  Nagel Cert. ¶ 2(vii) (Docket # 284).  Defendant Horizon stated that "Mr. Mazie misstates certain facts about the case and dramatically overstates his firm's contribution."  Horizon Br. 5 (Docket # 244).

result for the Class.[21]  Mazie Slater's litigation tactics did not, as it asserts, drive Defendants to the bargaining table.  Rather, the firm's vehement opposition to the *DeVito* template (which had been found to be fair, reasonable, and adequate) drove the Defendants to negotiate a full and fair resolution with Nagel Rice instead.  This Court "credit[s] Class Counsel's achievement in procuring a favorable settlement, something [Mazie Slater] ha[s] not done."  *Milliron*, 423 Fed. Appx. at 135.  Mazie Slater does not earn a fee for "contributing" to a type of settlement that it declared it would "never, ever" entertain.  Rhetoric has consequences.

### III. <u>CONCLUSION</u>

For the reasons set forth herein, Nagel Rice shall be paid a reasonable attorneys' fee. Mazie Slater has failed to meet its burden of proof to justify the allocation of such fee that it seeks.  The Court will, by separate Order, refer Nagel Rice's application for attorneys' fees and costs to a Special Master for a report consistent with the principles set forth in this Opinion.

**/s/ *Faith S. Hochberg***
Hon. Faith S. Hochberg
United States District Judge

---

[21]  Because the Special Master will be employing the lodestar method, the Court is not concerned that Nagel Rice may be compensated for work actually done by Mazie Slater.  Nagel Rice will only be compensated for work performed by its own attorneys.